Nos. 47,519 and 47,520

STEVEN L. TYLER, d/b/a TYLER ACOUSTICAL CEILING AND DRYWALL COMPANY, *Appellee*, v. COWEN CONSTRUCTION, INC., *Appellant*.

(532 P. 2d 1276)

Opinion filed March 1, 1975.

*John A. Biersmith,* of Kansas City, argued the cause, and *James W. Hicklin,* also of Kansas City, was with him on the brief for the appellant.

*Robert L. Eastman,* of Becker, Hildreth & Eastman, of Coffeyville, argued the cause, and *Richard L. Becker,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: These appeals stem from default judgments entered in favor of the plaintiff, Steven L. Tyler, d. b. a. Tyler Acoustical Ceiling and Drywall Company against Cowen Construction, Inc., defendant. For convenience we will refer to the parties as plaintiff or Tyler, on the one hand, and defendant or Cowen on the other.

The pertinent facts in each case are identical except as to dates, times and amounts. The parties are the same, the appeals were consolidated for hearing, and we shall attempt, as best we can, to make one opinion do for both appeals.

The defendant construction company, with offices in Tulsa, Oklahoma, had prime contracts on two jobs in Montgomery County, Kansas, (1) a medical clinic in Coffeyville, and (2) a Catholic community center in Cherryvale. Tyler had subcontracts with

Cowen for the drywall work on both jobs, in the amounts of $8,877.17 and $1944, respectively. A dispute arose between Tyler and Cowen over Tyler's performance of his work on the Coffeyville job. Cowen contended the work was faulty and had to be re-done. Apparently no controversy existed over Tyler's work on the Cherryvale project.

On November 5, 1973, Tyler filed mechanics' liens against both properties, showing a balance of $1014.90 due on the clinic job and $1944 on the community center. November 7, Mr. Steve Cowen, president of defendant company, retained Mr. William B. Lee, a Tulsa lawyer, to represent the defendant in its controversy with Tyler, and sent him copies of the lien statements. November 15, 1973, Tyler filed suit against Cowen to foreclose the lien on the Coffeyville property and to recover personal judgment against Cowen, as well. November 27, 1973, Tyler sued to foreclose the lien on the Cherryvale property and to recover a personal judgment.

Service in both cases was had on Cowen's registered agent residing in Kansas City. Mr. Biersmith, the agent, forwarded copies of the petitions and attachments to Cowen in Tulsa, where they were received December 10.

In the meantime, Mr. Lee had written Robert L. Eastman, of the Coffeyville firm of Becker, Hildreth & Eastman, requesting a reasonable time to research the case and to discuss the possibility of settlement. In response Mr. Eastman phoned Lee on December 4. There is disagreement as to whether Eastman advised Lee in this conversation that suits had been filed. Eastman said Lee was advised, while Lee contends he was not. At any rate, Lee conveyed Eastman's offer of settlement to Cowen, which rejected the offer, and Lee advised Eastman to this effect by phone the following day. Lee also told Eastman in this conversation that bonds would be filed to obtain release of the liens. The bonds were filed December 7 by B. D. Watson, a Coffeyville attorney.

Here matters stood until January 2, 1974, when Tyler filed motions for default judgments. On January 7, Mr. Lee received copies of these motions. That same day he wrote Biersmith in Kansas City. Mr. Badgerow, an attorney in Biersmith's office, called Mr. Lee the next morning and told Lee the lawsuits had been filed and service perfected on Cowen. A conference ensued between Lee and Steve Cowen following the call from Kansas City, during which Lee was given a copy of Biersmith's letter of December 6.

Mr. Lee contacted Mr. Watson in Coffeyville to represent Cowen at the hearing of the motions for default judgment which were set for hearing January 11. On January 10, Watson filed motions (1) to dismiss the actions and (2) for permission to file pleadings out of time. Because of bad weather the hearings were continued, first to January 12, and then to January 18.

Before January 18, Tyler filed motions to require Cowen to increase the face amount of the bonds already filed from $8,877.17 on the Coffeyville job, to $176,823, the total project cost, and from $1,944, the subcontract price on the Cherryvale job, to $63,549, the total cost of that project.

A hearing was held January 18 on all motions, both Tyler's and Cowen's. Cowen appeared by Mr. Watson. The court concluded at this time that "Cowen Construction, Inc., should be given one week to file a bond which complies with K. S. A. 60-1110" and "that the hearing on the motions should be continued" to January 25, 1974. (The dispute over the size of the bonds centered over whether the amount thereof should be the cost of the entire projects or that portion of the cost attributable to the subcontracts.)

At the adjourned hearing of January 25, 1974, Watson again represented Cowen and Tyler appeared by Eastman and Richard L. Becker. Mr. Lee was not present. Neither was Steve Cowen, president of the defendant company, or any member or any employee of that firm. No evidence was introduced but Mr. Watson filed and read an affidavit signed by Mr. Lee and received the day before. Many of the facts heretofore related have been gleaned from Lee's affidavit. In the affidavit Lee stated that Biersmith's letter of December 6, 1973, together with its enclosures, was received by Cowen on December 10, 1973, and "due to reduced office personnel during the holiday season same was inadvertently not directed to my attention." Lee further stated that Cowen was prepared to defend Tyler's claims and to cross-petition for damages which far exceeded Tyler's lien statements. In concluding his affidavit, Lee said he was prepared to appear personally at any time and answer all questions propounded, and that personnel from Cowen's firm "are also available to testify that I was not afforded sufficient knowledge to assist Cowen in the timely defense of Tyler's claim."

During the course of a somewhat lengthy colloquy between court and counsel, Watson advised the court that he had asked Lee "to

come up here today" to explain to the court the failure to answer in time and that Lee had called the other day and said he had a conflict and could not appear but was mailing an affidavit. Watson also reported that Cowen had not increased the size of the bonds because the cost would be substantially more than the amounts in controversy.

After counsel from both sides had their say, the hearing was concluded by the court as follows:

"THE COURT: The court finds there is no excusable neglect. This is based on a number of things. No. one, time after the answer date—but there was proper notice served upon these people. They didn't answer until long after the answer date. They sent Mr. Watson in here without the information necessary to represent them properly. They didn't furnish him what he needed to know. This matter was set at various times and it was set a week ago at which time Mr. Watson appeared on their behalf and was not informed sufficiently well to adequately represent them. This was due to their failure to inform him of what he needed to know. The matter was continued until today in order to give him an opportunity to show cause why default judgment should not be entered, why excuseable [sic] neglect could be shown. They appear only by affidavit in spite of the fact they state in the affidavit they are a large construction company with numerous personnel who can appear at any time. Nobody appears but Mr. Watson. Once again he is without the information necessary to properly represent them. He requested them to appear. They do not appear except in the person of Mr. Watson, although he specifically requested that they appear, they appear in the form of affidavit which cannot be cross-examined. The Court cannot acquire the information that it needs in order to make any decision other than inexcuseable [sic] neglect. I think they have just bungled this whole thing and failed to pay attention to this lawsuit and I also think they have failed to give this court the attention and respect that it needs in order to properly conduct its business. Under the circumstances I find the neglect to be inexcuseable [sic] and default judgment will be entered. As I understood it that applies to both cases, is that correct, Mr. Watson?

"MR. WATSON: Yes, sir.

"THE COURT: Both cases.

"MR. WATSON: We would like the record to show that we object to the granting of default judgment without introduction of any evidence, without any support or basis shown to the court in any manner.

"THE COURT: Well, Mr. Watson, you will admit you were given an opportunity to appear today and present any evidence that you wish to present and you requested your clients to be here to offer evidence and they totally failed to appear.

"MR. WATSON: I would agree to that.

"THE COURT: All right.

An application for rehearing was presented February 8, 1974, with Mr. Watson again representing Cowen. Mr. Lee made no appearance at this hearing nor did Mr. Cowen or anyone else from his

organization. No testimony was introduced at this hearing, with Mr. Watson telling the court:

"Judge, I could frankly have presented testimony at this hearing but it would merely have been cumulative to what is set out in the affidavit and I didn't think that was necessary. There is no dispute about, as I recall—any substantial dispute about what the facts are as set out in the affidavit that we submitted in support of our motion for permission to file out of time. I don't think the facts set out in that affidavit are substantially in dispute. . . ."

Much the same ground was gone over during this hearing as had been traversed before; it was largely an abbreviated re-run. The position taken by Mr. Watson was fairly summed up in his words:

". . . [I]t is our position that the matters set forth in the affidavits show a reasonable excuse and excusable neglect. . . ."

The court's final words were these:

"THE COURT: Well, the Court's ruling was based upon the fact that the defendants did not appear except through their attorney who had not been furnished sufficient information with which to conduct defendant's case. The Court continued the case in order to give the defendants an opportunity to appear and show excusable neglect. They failed to appear although stating they could and would appear at anytime, they totally failed to appear—instead filed affidavits on details which were in dispute—weren't available for cross-examination. It was impossible for the court to determine excusable neglect unless it accepted as totally true the statement of the defendants contained in the affidavit.

"The Court does not consider this an adequate performance on the part of the defendants. It does not consider that the defendants availed themselves of the opportunity to show excusable neglect. The Court's ruling that they failed to show excusable neglect is affirmed and the motion is denied."

Two points are briefed on appeal. It is first contended the judgments are void in purporting to enforce liens which were discharged by the bonds filed under K. S. A. 60-1110 (Corrick 1964). This relates to the argument between counsel over whether the statute required a bond in an amount equaling the cost of the entire project or only in such amount as the subcontract called for.

We see no need to determine that dispute. In his petition Tyler prayed for judgment not only foreclosing the mechanics' liens but for personal judgments against Cowen, as well. No judgment has been taken in either case foreclosing a lien and whether the bonds filed were sufficient to discharge the liens is immaterial at this stage of the proceedings.

The serious point is whether the trial court abused its discretion in denying the defendant's motion for leave to file an answer in each case and in entering a default judgment in each.

It is clear that defendant seeks to excuse its failure to answer or plead within the statutory time allowed on the basis of "excusable neglect." This is a ground recognized by our law, K. S. A. 1973 now (1974) Supp. 60-255 (*b*): "For good cause shown the court may set aside a judgment entered by default in accordance with K. S. A. 60-260 (*b*)", which in turn provides for relief on the grounds of mistake, inadvertence, surprise or *excusable neglect.*

Excusable neglect is a term somewhat nebulous. It touches an area in which there are few if any clear tangible signposts or guidelines. Whether excusable neglect is present or not in any given situation requires the judicious application of discretion. In *Boyce v. Boyce,* 206 Kan. 53, 476 P. 2d 625, we spoke of the term in these words:

"Excusable neglect as used in K. S. A. 60-206 (*b*) is not susceptible of clear definition. What constitutes excusable neglect under the statute must be determined by the trial court on a case by case basis under the facts presented in support of and in opposition to the enlargement of time. The trial court should consider the circumstances under which the neglect to act occurred as well as the effect of an enlargment upon the rights of all parties affected thereby." (pp. 55, 56.)

This court is mindful of the legal philosophy which favors the hearing of the claims of litigants on their merits, but we recognize also the necessity of achieving finality in litigation. (*Lackey v. Medora Township,* 194 Kan. 794, 796, 401 P. 2d 911; *Wilson v. Miller,* 198 Kan. 321, 322, 424 P. 2d 271; *Cadwallader v. Lehman,* 202 Kan. 738, 750, 451 P. 2d 163.) In the *Wilson* case, we said:

". . . [T]hat our entire judicial process for trial of civil controversies would be destroyed if a court's summons or other process were permitted to be treated with neglectful indifference." (p. 322.)

Any refusal to set aside a default judgment will, we are sure, seem harsh to the defaulting party. However, resulting severity, while a factor which might be given consideration in balancing equities, is by no means the sole yardstick for measuring excusable neglect. In *Montez v. Tonkawa Village Apartments,* 215 Kan. 59, 523 P. 2d 351, we discussed matters justifying a court in setting a default judgment aside. Our holding is expressed as follows:

"A motion to set aside a default may be granted whenever the court finds (1) that the nondefaulting party will not be prejudiced by the reopening, (2) that the defaulting party has a meritorious defense, and (3) that the default was not the result of inexcusable neglect or a willful act." (Syl. ¶ 4.)

That there was neglect in this case cannot be gainsaid. Cowen clearly failed to plead or answer within the time required. The de-

lay was Cowen's own, however, not Mr. Lee's. Service was properly obtained on Cowen through its resident agent, who promptly forwarded the papers to Cowen. Cowen did nothing about them for 29 days. In the meantime, the answer date had come and gone and motions for default judgments had been filed. And what excuse was offered to the court for this neglect? None whatever by any of Cowen's officers or employees who might have been in a position to explain the delay. The only attempted explanation came by way of an affidavit by Mr. Lee, who could have had no personal knowledge of the facts, that "due to reduced office personnel during the holiday season same was inadvertently not directed to my attention."

But laying aside the fact that Mr. Lee knew nothing of the papers which had been served on Cowen, until after the answer dates had expired, may it be said that Lee's explanation would amount to *excusable* neglect? Lee's explanation was that the papers were "*inadvertently* not directed to my attention." Inadvertent neglect, in our opinion, is not to be equated with excusable neglect. As we understand these terms, from a look at Webster's Third International Dictionary, inadvertently means inattentively, carelessly, heedlessly, while excusable means justifiable, pardonable, allowable, defensible.

How long may one be inadvertent, anyway, and still be excusable? It would depend on the circumstances of course. But, without any explanation at all, may neglect from December 10 to January 8 be said to be excusable because of the Christmas season? Is carelessnes to be justified—or excused—by a 29-day holiday, And what office personnel were gone for 29 days? Did the list include anyone whose duty it was to attend to matters in litigation; anyone who should have sent the papers to Mr. Lee? There is no explanation! It appears to us there is little distinction between the inadvertence referred to in Lee's affidavit and the neglectful indifference of which we spoke in *Wilson v. Miller*, supra.

Can it be said the trial court abused its discretion by finding "there is no excusable neglect." We believe not; we believe that no abuse of judicial discretion can be attributed to the court under the showing made by this record. The subject of judicial discretion has been treated in a variety of situations and has been variously defined. In *Reliance Insurance Companies v. Thompson-Hayward Chemical Co.*, 214 Kan. 110, 519 P. 2d 730, Chief Justice Fatzer said:

"The exercise of judicial discretion requires a judge have due regard for what is just under prevailing circumstances and not exercise that discretion in an arbitrary fashion. . . ." (p. 117.)

With respect to the exercise of judicial discretion, we said, in *Tilley v. International Harvester Co.,* 208 Kan. 75, 490 P. 2d 392:

"In the official reports of this court many decisions can be found relating to judicial discretion and the bounds of its exercise. In *Willoughby v. Willoughby,* 178 Kan. 62, 283 P. 2d 428, it was said of judicial discretion that it implies the liberty to act as a judge should act, upon fair judicial consideration, and not arbitrarily. The Court of Appeals for the Tenth Judicial Circuit, in *Atchison, Topeka and Santa Fe Railway Co. v. Jackson,* 235 F. 2d 390, described judicial discretion in these words:

" '. . . The term discretion when used as a guide to judicial action means sound discretion exercised with due regard for that which is right and equitable under the circumstances. It means discretion directed by reason and conscience to a just result, and it frequently involves painstaking consideration of many factors, giving to each the weight to which it is appropriately entitled. . . .' (p. 393.)" (pp. 78, 79.)

Abuse of discretion was succinctly put in the recent case of *Stayton v. Stayton,* 211 Kan. 560, 506 P. 2d 1172, in this way:

"Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion. . . ." (p. 562.)

In two of our most recent cases, *Reliance Insurance Companies v. Thompson-Hayward Chemical Co.,* supra, and *Montez v. Tonkawa Village Apartments,* supra, this court directed that default judgments against defaulting defendants be set aside on the basis that excusable neglect had been shown. Both cases can be distinguished on the facts.

In the *Reliance* case suit was filed against Thompson-Hayward (Thompson), and a co-defendant. Thompson did not plead by answer date and Reliance moved for default judgment, which was granted. Thompson moved to set the judgment aside. At an evidentiary hearing it was shown that Thompson, which was a subsidiary of a New York corporation, had transmitted the summons and petition to New York where they were received at the home office and placed on the desk of the company's corporate insurance officer. No action was taken for some eleven days because of the officer's absence due to the company's recent change of insurance carriers. Other and shorter delays were occasioned by transmittal of the

papers to New York and from there to the Hartford Insurance Group. We held the trial court erred in refusing to set the judgment aside.

A different set of facts appears in *Montez*. The plaintiffs lived in an apartment house owned by the defendant corporation. The action was filed to recover damages resulting to Mrs. Montez from a fall on icy steps leading to her apartment. Service was had on the resident manager of the apartment complex who managed its day-to-day operations. The manager put the papers on his desk, and no one ever saw them again. He speculated they must have fallen off the desk and were caught up in the trash. He forgot to tell any of his superiors about it. They first learned of the lawsuit some two months after default judgment was taken in Mrs. Montez' case. These facts were established by affidavits. The defendant moved to set the default aside, attaching thereto an answer. The trial court overruled defendant's motion. We reversed. In doing so we noted, among other factors to be considered, that "none of the principals, nor anyone else connected with the defendant with responsibility for such matters, had any actual knowledge of the suit; they cannot be charged with neglect of any kind." Such is not the case here. The suit papers in this case reposed in the defendant's own office for 29 days; they had not been placed on the desk of a distant apartment manager.

In *Montez* the following language is apropos:

"It may be observed that despite the wording of the rule the federal courts will refuse relief only where the neglect can be branded as 'inexcusable.' Such terminology is closely akin to our own phrase 'reckless indifference.' (*Reliance Insurance Companies v. Thompson-Hayward Chemical Co.*, supra, and cases cited therein.) It implies something more than the unintentional inadvertence or neglect common to all who share the ordinary frailties of mankind. . . ." (p. 65.)

Throughout the entire course of this litigation the defendant's attitude adds to the appearance of indifference. On three occasions, opportunity was provided both Mr. Lee and Cowen representatives to be present. On the second occasion an affidavit was filed by Mr. Lee stating he was prepared to appear personally and answer questions propounded of him. In the same affidavit he said that Cowen's personnel were available to testify. Yet not one of them appeared at the hearing on Cowen's motion for new trial, and Mr. Watson, again, was alone.

We see no abuse of discretion and the judgment of the court below is affirmed.