**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MARK E. HOPKINS,

      Defendant-Appellant.

No. 11-2114

(D.C. No. 2:09-CR-00863-MCA-1)
(D. N.M.)

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

SHARON J. HOPKINS,

      Defendant-Appellant.

No. 11-2115

(D.C. No. 2:09-CR-00863-MCA-2)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **KELLY** and **GORSUCH**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

unanimously that oral argument would not materially assist in the determination of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is, therefore, submitted without oral argument.

Mark Hopkins and Sharon Hopkins, husband and wife, (Defendants when referenced jointly) separately appeal their sentences which were imposed following their convictions for tax evasion and conspiracy to defraud the United States.  Both Mark and Sharon Hopkins appeal sentencing enhancements applied by the district court in calculating their sentences.  Sharon Hopkins appeals the district court's enhancement of her sentence for use of minors in the commission of the offense (U.S.S.G. § 3B1.4) and for her aggravating role in a criminal activity (U.S.S.G. § 3B1.1(c)).  Sharon Hopkins also appeals the district court's denial of her motion to dismiss the indictment for violation of her Sixth Amendment right to choice of counsel.  Mark Hopkins appeals the district court's enhancement of his sentence for obstruction of justice (U.S.S.G. § 3C1.1).  Exercising jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm.

I

*Factual Background*

After becoming increasingly involved in tax-protester groups,[1] Defendants

---

[1]  See Coleman v. Comm'r of Internal Revenue, 791 F.2d 68, 69 (7th Cir. 1986) ("'Tax protesters' have convinced themselves that wages are not income,

2

decided to stop "volunteering" to pay federal and state taxes. From 1996 to 2009, they paid no income tax. Instead, Defendants created several trust accounts, which they believed were tax proof, and designated family members and friends as trust beneficiaries and themselves as trust managers. The trusts were "sovereign trusts" sold to them by tax-protester seminar leaders who touted the trusts as tax exempt. Mark Hopkins, an emergency-room doctor, had his employers (medical institutions) pay his earnings to a trust, Shalom Enterprises, an entity incorporated under Oregon nonprofit law. According to Defendants Shalom Enterprises was a nonprofit ministry corporation, but in fact its funds were used to finance their living expenses. Defendants transferred funds and property among their numerous trusts to evade detection by the Internal Revenue Service (IRS). Predictably, Defendants faced mounting difficulties with the IRS, and on April 9, 2009, they were indicted on seven counts of tax evasion under 26 U.S.C. § 7201 and one count of conspiracy to defraud the United States under 18 U.S.C. § 371.

*District Court Proceedings*

The initial conditions of Mark Hopkins's pretrial release required him to pay $103,497 by October 27, 2009, and $34,499 on January 15, 2010, for his estimated liability for 2009 taxes. R. Suppl. Vol. 6, at 4. On October 16, 2009,

_____

that only gold is money, that the Sixteenth Amendment is unconstitutional, and so on.").

3

the district court conducted a show cause hearing regarding Mark Hopkins's alleged inability to meet the terms of the conditions of his pretrial release. After the hearing, the district court adopted the parties' agreed modification: Mark Hopkins would make a one-time payment of $60,000 into the court registry by October 27, 2009—rather than the IRS—and future monthly payments of $10,000 into the court registry "until such time as a legal determination is made as to Defendant's tax liability or until further order of the Court." Id. at 2.

Thereafter, on June 4, 2010, Defendants filed a joint emergency motion for modification of the conditions of pretrial release and for release of the funds, totaling $130,000, which were previously paid into the court registry pursuant to the pretrial release conditions. Defendants argued that due to unexpected medical, legal, and living expenses, they were facing financial difficulties that affected their ability to pay for their legal defense; they argued that an inability to use the court registry funds would violate their Sixth Amendment rights to counsel of choice.

On June 18, the district court, "sua sponte reconsidered the matter of the escrowed deposits and . . . conclude[d] that the escrowed monies should be returned because the Court finds that it should not interpose itself between Defendants and the civil taxing authorities with respect to the obligations relating to estimated taxes." Id. at 6-7 (emphasis omitted) (ordering that "all funds that have been paid into the Court Registry by Defendants shall be released directly to

Mark Hopkins upon entry of this Order"). Accordingly, the district court modified the pretrial release conditions by no longer requiring payments into the court registry and ordered the court clerk to release the funds previously paid into the court registry. The district court "strongly reminded" Defendants that failure to pay quarterly estimated tax payments would violate federal law, which would in turn violate the conditions of pretrial release. Id. at 6-7.

Four days later, on June 22, 2010, the IRS served a notice of levy, pursuant to I.R.C. § 6331(1), for the court registry funds held by the court clerk to collect past due taxes for tax years 1996 and 1997 totaling $504,317.75. At the time of the notice of levy, the court clerk had not yet acted on the district court's order to release the funds to Mark Hopkins. Unsure of the proper course of action, the court clerk filed an interpleader action for determination of the respective parties' rights to the funds.

In response to the IRS's levy, Defendants filed in the criminal action an emergency motion for release of the levied funds, which the district court denied the following day, explaining that "[t]he jurisdiction of the District of New Mexico [was] . . . invoked properly by the filing of an Interpleader action." R. Suppl. Vol. 9, at 1. After this denial, Defendants filed a second motion for the same relief on July 14, but now asserted constitutional issues as the basis for relief. Again, the district court denied this motion.

The following day, Sharon Hopkins's counsel, Jonathan Altman, moved to

5

withdraw as counsel for nonpayment of legal fees, which the district court granted.[2] After briefly appearing pro se, Sharon Hopkins opted for court-appointed counsel. The court appointed counsel on August 23. Shortly thereafter, Sharon Hopkins retained Tommy Cryer. And, on September 10, the district court terminated her court-appointed counsel. Mr. Cryer, as lead counsel, and Mr. Hanisee, as local counsel, represented Sharon Hopkins from that point through trial and sentencing. Mr. Becraft and Mr. Hanisee continued to represent Mark Hopkins through trial and sentencing.

On July 29, 2010—before Sharon Hopkins retained Mr. Cryer, but after her counsel, Mr. Altman, withdrew—Defendants filed a motion to dismiss the indictment contending their Sixth Amendment rights were violated by the levy and their resulting inability to use the funds for defense purposes. On August 20, the district court denied the motion to dismiss the indictment, concluding that the government had not unconstitutionally restrained Defendants' assets by filing a levy on the court registry funds. R. Suppl. Vol. 4 pt. 2, at 383-84. Relying on United States v. Nichols, 841 F.2d 1485 (10th Cir. 1988), the court concluded that the government's interest in obtaining the levied funds was substantial, and the

---

[2] After brief representations by public defenders early in the criminal prosecution, Defendants retained Larry Becraft, who appeared pro hac vice, and Miles Hanisee, as local counsel, as their defense counsel. Around February or March 2010, Sharon Hopkins terminated Mr. Becraft as her counsel and, in April 2010, hired Jonathan Altman.

IRS's explanation for the timing of the levy credible. Accordingly, the district

court concluded that it was reasonable for the IRS to file a levy after the court

ordered the funds released to Mark Hopkins, and that the levy did not violate their

Sixth Amendment rights. The district court was not persuaded by Defendants'

argument that this case was similar to the facts in United States v. Stein, 541 F.3d

130 (2d Cir. 2008), and denied their motion to dismiss the indictment.

On December 17, 2010, the court in the interpleader action found that the

IRS was entitled to the court registry funds through the execution of its levy and

that Defendants were not entitled to the payment of attorney fees or costs out of

the interpled funds. Between the filing and resolution of the interpleader action,

Defendants filed for bankruptcy and were convicted of tax evasion: On

September 3, 2010, they voluntarily filed for Chapter 13 bankruptcy,[3] and on

September 29, after a seven-day trial, a jury found them guilty of seven counts of

tax evasion under 26 U.S.C. § 7201 and one count of conspiracy to defraud the

United States under 18 U.S.C. § 371.

*Sentencing*

At Sharon Hopkins's sentencing hearing, the district court adopted the

factual findings and conclusions of the PSR, with the exception of finding an

---

[3] The automatic stay was lifted by the bankruptcy court to allow the United States to proceed in the interpleader action. Order, In re Hopkins, No. 10-14543-s13 (Bankr. D.N.M. Oct. 7, 2010), ECF 18; see 11 U.S.C. § 362.

enhancement for obstruction. The district court concluded that the other enhancements—the aggravated role, the use of minor, and the sophisticated means enhancements—were warranted and increased her base offense level by six, to an offense level of 28. The district court then sentenced Sharon Hopkins to 97 months' imprisonment and a three-year term of supervised release following imprisonment. The district court additionally ordered her to pay the IRS $1,744,222.26 in restitution, owed jointly and severally with her husband.

At Mark Hopkins's sentencing hearing, the district court adopted in full the factual findings and conclusions of the PSR, for a criminal history category of I and an offense level of 30. The district court found all of the enhancements recommended in the PSR were warranted and sentenced him to 120 months' imprisonment and a three-year term of supervised release following imprisonment. The district court additionally ordered him to pay the IRS $1,744,222.26 in restitution, owed jointly and severally with his wife.

## II

Sharon Hopkins first argues the district court's denial of her motion to dismiss the indictment resulted in structural error. She argued in her motion that the IRS violated her Sixth Amendment rights by wrongfully levying on funds she intended to use to finance her criminal defense.

"Generally, we review the grant or denial of a motion to dismiss an indictment for an abuse of discretion." United States v. Giles, 213 F.3d 1247,

8

1248 (10th Cir. 2000).  When a "case[] implicat[es] a criminal defendant's sixth amendment right to counsel[, however,] the abuse of discretion standard is simply too deferential where such a fundamental constitutional right is affected."  United States v. Collins, 920 F.2d 619, 628 (10th Cir. 1990) (quotation omitted) (reviewing de novo district court's revocation of counsel's pro hac vice admission).  Accordingly, we review de novo whether Sharon Hopkins's Sixth Amendment right to counsel of choice was violated by the government's levy on the court registry funds.  See United States v. Sandia, 188 F.3d 1215, 1217 (10th Cir. 1999) (reviewing de novo "[t]he district court's decision to deny the motion to dismiss [the indictment] based on defendant's religious rights under RFRA[, ]a question of law").

*Sixth Amendment Right to Counsel*

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  Included in this right "is the right of a defendant who does not require appointed counsel to choose who will represent him," which "stems from a defendant's right to decide what kind of defense he wishes to present."  United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006); Collins, 920 F.2d at 625.  When a defendant is wrongly denied her right to choice of counsel, such deprivation is "complete" at the time of denial, "regardless of the quality of the representation [s]he [ultimately] receive[d]."

9

Gonzalez-Lopez, 548 U.S. at 148; United States v. Jones, 160 F.3d 641, 646 (10th Cir. 1998) ("[T]he selection of one attorney over another can profoundly affect the course and outcome of trial."). No showing of prejudice is required to establish constitutional error because such a deprivation is a "structural error." Gonzalez-Lopez, 548 U.S. at 150. A defendant also has a "right to be represented by an otherwise qualified attorney whom [the] defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1989).

"Although there is a presumption in favor of a defendant's counsel of choice, the right is not absolute." United States v. McKeighan, 685 F.3d 956, 966 (10th Cir. 2012). A defendant does not have a constitutional right to counsel that declines representation, counsel beyond the defendant's "'financial ability to . . . retain,'" or counsel whose representation would not be "consistent with the fair administration of justice." Id. (quoting Nichols, 841 F.2d at 1504). Moreover, a defendant's Sixth Amendment right does not extend to the "use of the proceeds of crime to finance an expensive defense." Caplin, 491 U.S. at 630 (quotation omitted). "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988).

### 1) Relevance of Caplin

The government argues this case is controlled by Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989), where the Supreme Court held that a criminal defendant's Sixth Amendment rights were not violated when his assets (which he intended to use as payment for counsel) were forfeited via operation of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 853(a). 491 U.S. at 630. In Caplin, the criminal defendant transferred $25,000 to his counsel for payment of preindictment legal services in violation of the district court's restraining order prohibiting the criminal defendant from transferring assets that were potentially forfeitable. Id. at 619-20. The Court concluded that the defendant did not have good title to the funds because § 853(c) vested title of forfeitable assets in the government at the time the criminal act giving rise to the forfeiture was committed. Id. at 627. Accordingly, the defendant could not "give good title to such property to [his attorneys] because he did not hold good title." Id. The Court further explained, "[t]here is no constitutional principle that gives one person the right to give another's property to a third party, even where the person seeking to complete the exchange wishes to do so in order to exercise a constitutionally protected right." Id. at 628.

The government relies on Caplin to argue that it had superior claim to the funds in the court clerk's possession because it filed a levy on the funds to satisfy 1996 and 1997 tax liabilities totaling over $504,000. Sharon Hopkins counters

11

this argument by attempting to limit Caplin's holding to "§ 853's forfeiture provisions do not violate a criminal defendant's Sixth Amendment rights," which, she argues, renders it of "little relevance to this case." Aplt. S.H. Reply Br. at 3. She asserts that Caplin is not controlling here because the government's interest in the funds arose through execution of a levy pursuant to the Internal Revenue Code, rather than a criminal forfeiture statute. She does not, however, dispute the government's authority to file a levy on the funds.[4]

---

[4] Here, the government's lien and subsequent levy were executed pursuant to the Federal Tax Lien Act (FTLA), I.R.C. §§ 6321, 6331. A federal tax lien is created after assessment, notice thereof, demand, and failure to pay taxes. I.R.C. §§ 6303(a), 6321. The lien attaches to all the taxpayer's property and rights to property at the time it is created as well as to after-acquired property. Glass City Bank v. United States, 326 U.S. 265, 268 (1945) (interpreting § 6321's predecessor, § 3670). Generally, "[t]he reach of a federal tax lien is broad," reaching "'every interest in property that a taxpayer may have.'" Kane v. Capital Guardian Trust Co., 145 F.3d 1218, 1221 (10th Cir. 1998) (quoting United States v. Nat'l Bank of Commerce, 472 U.S. 713, 719-20 (1985)). The lien continues—even when the property is transferred to a third party—until the resulting liability is either satisfied or becomes unenforceable through lapse of time. I.R.C. § 6322; Russell v. United States, 551 F.3d 1174, 1179 (10th Cir. 2008) ("The transfer of the attached property 'does not affect the lien because no matter into whose hands the property goes, the property passes cum onere, or with the lien attached.'" (quoting United States v. Cache Valley Bank, 866 F.2d 1242, 1244-45 (10th Cir. 1989))). Tax liens are not self-executing. Kane, 145 F.3d at 1221. Accordingly, tax law empowers the IRS to collect delinquent taxes through judicial and nonjudicial remedies, or administrative levies. Pursuant to I.R.C. § 6331(a), the "Secretary [may] collect [delinquent] tax[es] . . . by levy upon all property and rights to property[, with certain exceptions,] . . . belonging to [a delinquent taxpayer]." Before the government may file a levy on the property, however, the person liable for unpaid taxes must neglect or refuse to pay within 10 days after notice and demand of payment. Id. "Levy" is defined as "the power of distraint and seizure by any means," and the "Secretary may levy upon property or rights to property [and] . . . seize and sell such property or rights to

We acknowledge that the IRS administrative lien and levy procedures do differ from the criminal forfeiture statute: the forfeiture statute has a relation-back provision which results in the divestiture of title at the time the criminal act was committed, unlike the IRS lien and levy procedures.[5] But this distinction does not persuade us that Caplin is not controlling here. Especially in light of the Court's statement that "[c]riminal defendants . . . are not exempted from federal, state, and local taxation simply because these financial levies may deprive them of resources that could be used to hire an attorney." 491 U.S. at

property (whether real or personal, tangible or intangible)." Id. § 6331(b); see LaRosa's Int'l Fuel Co. v. United States, 499 F.3d 1324, 1328-29 (Fed. Cir. 2007) (describing the meaning of distraint and the effects of levy). The power to levy may be extended to "any other property liable to levy . . . until the amount due from [the delinquent taxpayer], together with all expenses, is fully paid." I.R.C. § 6331(c). "Upon service of the notice of levy [for intangible property], the IRS 'steps into the shoes of the taxpayer and acquires "whatever" rights to the property the taxpayer possessed.'" Kane, 145 F.3d at 1221 (quoting United States v. Bell Credit Union, 860 F.2d 365, 369 (10th Cir. 1988)). "Unlike the lien-foreclosure suit authorized by 26 U.S.C. § 7403, an administrative levy does not determine priority disputes between the Government and other claimants, but instead protects the Government against diversion or loss while such disputes, if any, are resolved." Id.

[5] In United States v. Whiting Pools, Inc., 462 U.S. 198 (1983), the Supreme Court stated that the remedies provided to the IRS by I.R.C. §§ 6331 and 6332 "are provisional remedies that do not determine the Service's rights to the seized property, but merely bring the property into the Service's legal custody. . . . Ownership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale." 462 U.S. at 211. See United States v. Triangle Oil, 277 F.3d 1251, 1256 (10th Cir. 2002) (citing United States v. Challenge Air Int'l, Inc., 952 F.2d 384, 386-87 (11th Cir. 1992) (declining to limit Whiting Pool's holding to tangible property)) ("[A]bsent a foreclosure or similar action[,] the taxpayer still retains ownership of the property.").

13

631-32 & n.8 (emphasis added) (citing United States v. Brodson, 241 F.2d 107, 108-11 (7th Cir. 1957) (en banc) (holding that the defendant's inability to "defray the expenses of his defense, particularly to engage the services of an accountant," due to tax lien, did not violate his Sixth Amendment rights)); see United States v. Rogers, 984 F.2d 314, 316 (9th Cir. 1993) (applying Caplin's holding and determining that "the mere fact that the jeopardy [tax] assessment deprived [the defendant] of the resources to hire the investigators and accountants of his choice d[id] not in itself violate the sixth amendment").

Moreover, the Caplin Court reasoned that "there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." 491 U.S. at 631. As in Caplin, the government has a longstanding, strong interest in collecting delinquent taxes and securing its interests in delinquent taxpayer's property through liens and levies. See G.M. Leasing Corp. v. United States, 429 U.S. 338, 350 (1977) ("[T]he existence of the levy power is an essential part of our self-assessment tax system . . . that . . . enhances voluntary compliance in the collection of taxes."); Glass City Bank, 326 U.S. at 267 ("Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes."). And, its extensive lien and levy powers exemplify this strong interest. See, e.g., Kane, 145 F.3d at 1221 ("The reach of a federal tax lien is broad," reaching "'every interest in property

14

that a taxpayer may have.'" (quoting Nat'l Bank of Commerce, 472 U.S. at 719-20)).

Caplin specifically referenced jeopardy assessments, which allow for immediate tax assessment, notice, and demand—without adherence to the requirements of § 6213—because "the assessment or collection of a deficiency . . . will be jeopardized by delay." I.R.C. § 6861(a). While the assessments used here were not jeopardy assessments, we do not find this distinction sufficient to overcome Caplin. Here, the IRS filed a tax lien in 2004 for previously assessed tax liabilities for 1996, 1997, 1999, 2000, and 2001 tax years. See Aplee. Addendum Vol. 1, exs. 102, 103 (assessments for 1996 and 1997 tax years). Accordingly, the procedure here afforded Defendants greater rights than a jeopardy assessment, and they could have contested, but chose not to contest, the 1996 and 1997 tax assessments in tax court. See id.

When it filed a levy on the court registry funds, "the IRS stepp[ed] into the shoes of [Defendants] and acquire[d] whatever rights to the [funds] . . . [they] possessed." Kane, 145 F.3d at 1221 (quotation omitted). While the government's levy may have impacted whether Sharon Hopkins could pay Mr. Altman, this alone does not amount to a Sixth Amendment violation. See Caplin, 491 U.S. at 626 ("A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his . . . .");

15

see United States v. Thomas, 577 F. Supp. 2d 469, 476 (D. Me. 2008) (holding no

Sixth Amendment violation when defendant unable to retain counsel of choice

due to IRS levy on funds intended to pay for defense).  The government was

within its rights to file the levy, which limited Sharon Hopkins's right to the same

funds.  Her argument that this case is not controlled by Caplin simply because the

funds at issue were subject to a levy under the Internal Revenue Code, rather than

a criminal forfeiture statute, is not compelling.[6]  See Stein, 541 F.3d at 155 ("The

holding of Caplin [] is narrow:  the Sixth Amendment does not prevent the

government from reclaiming its property from a defendant even though the

defendant had planned to fund his legal defense with it.").

## 2) Arbitrary Interference

Sharon Hopkins next argues that even if the present case is controlled by

Caplin, her Sixth Amendment right to counsel was violated because the

government's levy, and the district court's acquiescence in it, was arbitrary.[7]  As

---

[6]  In a decision announced the same day as Caplin, the Court described Caplin as holding, "neither the Fifth nor the Sixth Amendment to the Constitution requires Congress to permit a defendant to use assets adjudged to be forfeitable to pay that defendant's legal fees."  United States v. Monsanto, 491 U.S. 600, 614 (1989).

[7]  Initially, Sharon Hopkins seems to argue the district court erred by finding that only improper or erroneous deprivations of a defendant's counsel of choice violate the Sixth Amendment.  Aplt. S.H. Br. at 17 ("[T]he district court sought to side step the holding in Gonzalez-Lopez by stressing that the deprivation of counsel of choice only violates the Sixth Amendment if the court or the government 'erroneously or arbitrarily limited defendants' ability to retain their counsel of choice.'").  But she provides no authority for this assertion,

16

support for this argument, she asserts that the levy violated two IRS guidelines and cites the timing of the levy, which was imposed weeks before trial. Regarding the latter, she makes a broad argument that the IRS, in coordination with the Assistant United States Attorney, chose to levy the court registry funds at this particular time in order to inhibit her ability to mount a defense at trial. Aplt. S.H. Reply Br. at 7 ("In light of these facts and the <u>obvious coordinated effort between the IRS and prosecutors</u> handling the trial of this matter, the levy on the funds in the court registry suggests targeted action to improve the prosecution's chances of obtaining a conviction." (emphasis added)).

She does not cite, however, anything to evidence such a coordinated campaign, and the government countered this contention by proffering legitimate reasons for the levy. See <u>Nichols</u>, 841 F.2d at 1508 ("We do not assume that the government [] abuse[d] its discretion."); <u>see</u> <u>also</u> <u>United States v. Marshall</u>, 526 F.2d 1349, 1355 (9th Cir. 1975) (concluding that "a defendant must also show a bad faith connection between the prosecution and the alleged unwarranted tax collection effort in order to prevail" under a similar theory of misconduct). Specifically, the government decided to proceed with the levy to secure payment

---

which is contrary to Supreme Court and Tenth Circuit precedent clearly holding otherwise. See <u>Gonzalez-Lopez</u>, 548 U.S. at 146 (finding the right to choose counsel violated "because the deprivation of counsel was erroneous"); <u>McKeighan</u>, 685 F.3d at 969 ("Only improper or 'erroneous' deprivations of a defendant's counsel of choice violate the Sixth Amendment."). Accordingly, to the extent that Sharon Hopkins makes this argument, it is not persuasive.

17

of delinquent taxes and because Mark Hopkins rarely maintained property in his name.

*a) Manual 5.1.5.11*

Sharon Hopkins claims that the levy violated two Internal Revenue Manual provisions, which, she argues, proves the government's action was arbitrary.[8] Manual 5.1.5.11 addresses "whether even the passive-type collection activity would tie up the taxpayer's assets to the extent that the taxpayer would be unable to finance a defense of the potential criminal prosecution." R. Suppl. Vol. 4 pt. 2, at 285 (emphasis omitted). The district court concluded that the government's actions "arguably complied with the procedure" because it believed that Sharon Hopkins could afford to pay her counsel, which mooted the government's request for discovery regarding Defendants' available assets. Id. at 379. Sharon Hopkins concedes that her husband, "earned nearly $700,000 in the year and a half leading up to trial," but argues that the funds subject to the levy were her "last hope for retaining her counsel of choice, Mr. Altman." Aplt. S.H. Reply Br. at 15. Sharon

---

[8] Sharon Hopkins argues the district court erred in concluding that the Manual provisions were not relevant to whether the government acted arbitrarily. See R. Suppl. Vol. 4 pt. 2, at 379 ("Whether the Government adhered to internal IRS policies is not relevant to whether the Government acted constitutionally when it restrained Defendants' assets." (citing United States v. Scott, 37 F.3d 1564, 1583 (10th Cir. 1994)). Scott, dealt with whether due process was implicated by violation of an IRS Manual provision, which is not the issue here. 37 F.3d at 1582. As Sharon Hopkins points out, however, the district court considered the Manual anyway. R. Suppl. Vol. 4 pt. 2, at 379-80 (determining that the government believed it was in compliance with its Manual).

18

Hopkins goes on to state that her husband used his earnings to pay for his representation, but not her representation.

Regardless of whether her husband "gave" her the money, New Mexico is a community-property state where "earnings attributable to the labor and talent of a spouse are community property." DeTavis v. Aragon, 727 P.2d 558, 563 (N.M. App. 1986). Accordingly, "each spouse in a marriage has a present, vested, one-half interest in the spouses' community property." Ruggles v. Ruggles, 860 P.2d 182, 192 (N.M. 1993). While Sharon Hopkins's attorney of choice withdrew his representation shortly after the government filed its levy, there is no indication that she was unable to pay for her defense due to the tax levy. In fact, she was able to retain, and ostensibly pay for, private counsel through trial and sentencing. When considered in context, it was not arbitrary or erroneous for the government to conclude that levying the funds would not violate Manual 5.1.5.11 in light of Defendants' considerable earnings during the time period leading up to trial. Accordingly, Sharon Hopkins's argument that the government acted arbitrarily because it violated this Manual provision is unpersuasive.

*b) Manual 5.11.1.3.3*

Manual 5.11.1.3.3 states that "IRC 6332(a) provides that property subject to attachment or execution under any judicial process is not subject to levy. Also, the IRS generally does not levy on assets in the custody or control of a court because that would interfere with the court proceeding." R. Suppl. Vol. 4 pt. 2, at

19

286. While the government filed the levy after the district court ordered release of the funds, it filed the levy before the funds were released by the clerk of the court. The government argues that the funds were no longer in the custody or control of the district court after the June 18 order releasing the funds. Aplee. Br. at 22 (citing United States v. Bd. of Cnty. Comm'rs for Lucas Cnty., No. C 76-35, 1978 WL 4506, at *4 (N.D. Ohio May 19, 1978) ("[A] fund held by a public official ceases to be in custodia legis when the court has determined who is entitled to the fund, and has ordered payment thereof."). See also Laughlin v. Lumbert, 362 P.2d 507, 509 (N.M. 1961) (concluding that "when the court has determined to whom the money in the possession of the court's officer should be delivered, whereupon he becomes responsible to that person rather than to the court, the same is subject to garnishment"). Sharon Hopkins counters that the levy violates this provision because "the funds were always in the possession of the court[] and ultimately remained in the custody of the clerk due to the interpleader action." Aplt. S.H. Br. at 21.

The funds were held by the court clerk pending resolution of the interpleader action, but the interpleader action was a direct consequence of the filing of the levy. Accordingly, the levy could not interrupt the interpleader action. Regarding the criminal action, the district court here specifically stated in its order that it was releasing the funds to Mark Hopkins to remove the court from any dispute between the IRS and Defendants. R. Suppl. Vol. 6, at 6 (concluding

20

"that the escrowed monies should be returned because the Court finds that it should not interpose itself between Defendants and the civil taxing authorities with respect to the obligations relating to estimated taxes"). This statement supports the IRS's conclusion that a levy would not interfere with a court proceeding because the district court explicitly stated its desire not to interject itself between the parties. The IRS's view aligns with the Manual provision not to "interfere with [] court proceeding[s]." R. Suppl. Vol. 4 pt. 2, at 286. Accordingly, Sharon Hopkins's argument that the government's levy was arbitrary because it violated IRS Manual provisions is not persuasive.[9]

Sharon Hopkins's attempts to distinguish her case from Caplin and similar precedent are unpersuasive. The government has demonstrated, through its lien and levy procedures, that it has a legitimate interest in the funds she sought. Nichols, 841 F.2d at 1505. While she "claims that [s]he has suffered some

---

[9] Toward the end of her argument, Sharon Hopkins indicates that her trial counsel was not adequately prepared to defend her at trial because he was retained three weeks before trial. While a district court's denial of a motion to continue may infringe on a defendant's Sixth Amendment rights, especially when the attorney was retained shortly before trial, she did not seek a continuance of her trial date once she obtained counsel. See United States v. La Monte, 684 F.2d 672, 673-74 (10th Cir. 1982). Nor could she raise a claim of ineffective assistance of counsel on direct appeal. See United States v. Galloway, 56 F.3d 1239, 1240-41 (10th Cir. 1995) (en banc). Moreover, the actual quality of representation at trial is not relevant to the choice-of-counsel Sixth Amendment inquiry. Gonzalez-Lopez, 548 U.S. at 148 ("Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received.").

substantial impairment of [her] Sixth Amendment rights by virtue of the [levy] . . . , such a complaint is no more than the reflection of 'the harsh reality that the quality of a criminal defendant's representation frequently may turn on h[er] ability to retain the best counsel money can buy.'" Caplin, 491 U.S. at 630 (quoting Morris v. Slappy, 461 U.S. 1, 23 (1983) (Brennan, J., concurring)). Accordingly, Sharon Hopkins's Sixth Amendment rights were not violated by the levy.

*Sentencing Enhancement*

Sharon Hopkins also asserts the district court committed two sentencing errors: first, the district court erred by enhancing her offense level under U.S.S.G. § 3B1.4 for the use of minors, and, second, the district court erred by enhancing her offense level under § 3B1.1(c) for her role as a leader or organizer in the criminal activity.

Because her counsel raised objections to these enhancements before the district court, this court reviews de novo the district court's legal conclusions regarding the guidelines and reviews its factual findings for clear error, "giving due deference to the district court's application of the guidelines to the facts." United States v. Maestas, 642 F.3d 1315, 1319 (10th Cir. 2011) (quoting United States v. Doe, 398 F.3d 1254, 1257 (10th Cir. 2005) (quotation omitted)). "A finding of fact is clearly erroneous only if it is without factual support in the record or if the appellate court, after reviewing all of the evidence, is left with a

22

definite and firm conviction that a mistake has been made." Id. (quoting United States v. Talamante, 981 F.2d 1153, 1158 (10th Cir. 1992) (quotation omitted)).

Sharon Hopkins raised both objections before the sentencing court, but objected only to the legal conclusions drawn from the findings of fact in the PSR, not the factual findings in the PSR. Accordingly, the district court adopted the PSR's factual findings and ruled on Sharon Hopkins's objections to the enhancements.

### 1) Use of a Minor Enhancement

Section 3B1.4 provides for enhancement of a defendant's offense level by 2 levels if "the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. Under the application note, "using" includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." Id. cmt. n.1. This section does not require an enhancement whenever a defendant commits a crime with a confederate minor. See United States v. Suitor, 253 F.3d 1206, 1210 (10th Cir. 2001). Rather, enhancement is warranted when "a defendant directs, trains, or in some other way affirmatively engages the minor participant in the crime of conviction." Id.

Sharon Hopkins argues on appeal that the enhancement was unwarranted because there was no evidence that she had the children sign the trusts; she argues the district court imposed this enhancement solely based on her "mere

23

participation in the tax evasion conspiracy" or based on the foreseeability that

Mark Hopkins would have the children sign the trusts. Aplt. S.H. Br. at 32. The

sentencing court concluded that enhancement was warranted because

> the trusts were created very clearly -- and the evidence bore this out
> -- to avoid payment and as part of a scheme to avoid payment of the
> federal and state taxes and also to evade the tax laws. And these
> trusts were created by both the husband and the wife, by Mrs.
> Hopkins and her husband, to accomplish this purpose, to conceal
> income and to conceal assets and to evade taxes, and these friends
> and family, in the case of the children, the minors, were noted on
> these trusts to facilitate and accomplish these particular purposes.

R. Suppl. Vol. 1, at 14.

Contrary to Sharon Hopkins's assertion otherwise, the district court did not

apply this enhancement because it was foreseeable that Mark Hopkins would

obtain the minors' signatures on the trusts; rather, the record supports that Sharon

Hopkins, herself, obtained the minors' signatures for the trusts. Aplt. S.H. Br. at

30 (citing United States v. Acosta, 474 F.3d 999, 1002-03 (7th Cir. 2007)

(holding reasonable foreseeability of use of minor by co-conspirator insufficient

to apply enhancement)).

Specifically, Sharon Hopkins testified at trial that she "was the one who

implemented [the trusts]," and that her husband would "take care of all the letter

writing, and I would take care of this type of business. And so I made the

decision." R. Vol. 3 pt. 3, at 200-01. The PSR and the Second Addendum to the

PSR both stated that Sharon Hopkins obtained the minors' signatures for the trust.

24

R. Vol. 2, at 21 ("They[, Defendants,] also named their children, including three of their minor children, as certificate holders and had them sign the certificates." (emphasis added)); R. Suppl. Vol. 7, at 3 (same). Sharon Hopkins did not object to the PSR's findings of fact supporting enhancement, and their adoption by the district court, that she obtained the minors' signatures. In fact, her counsel agreed at sentencing that she had the minor children sign the trusts. R. Suppl. Vol. 1, at 9 ("[T]he Defendant[, Sharon Hopkins,] acknowledges that she and her husband had the minor children sign some documents regarding the creation of some trusts."); id. at 42 (answering in the negative to whether there were "any objections to any of the [PSR] factual findings").[10]

Nor do the cases cited by Sharon Hopkins persuade us that the district court erred by enhancing her sentence under this section. Unlike the use of minors in the cited cases, Sharon Hopkins procured the minors' signatures as beneficiaries of trusts designed to evade tax authorities' discovery of money transferred to and between the numerous trusts. Cf. United States v. Parker, 241 F.3d 1114, 1121-22 (9th Cir. 2001) (determining that without evidence that the defendant took affirmative steps to involve the minor in the robbery, fact that co-conspirator was minor was insufficient to satisfy enhancement); United States v. Pojilenko,

_____

[10] Sharon Hopkins's counsel did object to the PSR's characterization of the their tax law beliefs, but ultimately concluded that such distinctions were not material for sentencing purposes. R. Suppl. Vol. 1, at 42.

416 F.3d 243, 247 (3d Cir. 2005) (holding that the defendant's telephone conversation with minor confederate informing him of robbery details insufficient for application of enhancement). The minors involved here were not co-conspirators or confederates; they were Defendants' children who were affirmatively engaged by their parents to become beneficiaries of trusts used for criminal purposes. See United States v. Keck, 643 F.3d 789, 800 (10th Cir. 2011) (determining enhancement warranted "[b]ecause Keck used his daughter, a minor, to wire money" to effectuate a money-laundering scheme).

Moreover, the enhancement was still warranted regardless of whether the trusts were created for legitimate estate-planning purposes or whether the minors' signatures were unnecessary to execute the documents.[11]  Whether necessary or

---

[11] We respectfully disagree with the dissent's conclusion that the district court erred by enhancing Sharon Hopkins's sentence for use of minors. The dissent asserts that designating and procuring signatures from minors on tax-evading trusts does not amount to "use" of a minor. Specifically, the dissent states, "[d]esignating a minor a trust beneficiary certainly would not qualify as facilitating the concealment of income or tax evasion—nothing suggests that these minors were empowered to direct income into or manage the trust or its distributions. Nor should the minors' signatures acknowledging their status as beneficiaries do so either." Dissent at 3 (citation omitted). We disagree. The children need not have power over trust income in order for the district court to find that Sharon Hopkins "affirmatively engaged" the minors in the tax-evasion scheme, nor is a showing that Sharon Hopkins actively conspired with the minors required. Id. ("Nothing suggests that Dr. or Mrs. Hopkins 'used' these minors, or even that they somehow became their co-conspirators or confederates in the commission of the offense."). See United States v. Tran, 285 F.3d 934, 937-38 (10th Cir. 2002) (rejecting the defendant's interpretation of "use" as "'[t]he defendant must inform the minor of the criminal purpose for which the minor's services are wanted and induce, or try to induce, the minor to commit the federal

26

not, Sharon Hopkins had minors sign trust documents that were used to criminally evade tax liability. To the extent that these documents also implemented some noncriminal, family-estate-planning purpose, that legitimate purpose does not negate the illegitimate, criminal use. Accordingly, the district court's finding that Sharon Hopkins used minors in the commission of the offense of conviction is supported by the record and not erroneous.

## 2) Leader or Organizer Enhancement

Finally, Sharon Hopkins argues the district court erred by applying the leader or organizer enhancement under U.S.S.G. § 3B1.1(c), which states, "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." The Guideline commentary suggests consideration of the following factors when determining

offense in question'" (alteration in original)); see also United States v. Vivit, 214 F.3d 908, 920 (7th Cir. 2000) (finding the defendant's "direct[ion to a minor patient] to sign the attendance sheet [that] fraudulently . . . inflated the number of visits" she paid to the defendant-physician was sufficient "use" in his insurance-fraud scheme to warrant enhancement).

Even if we agreed that obtaining trust signatures was unnecessary for the commission of tax evasion, enhancement is still warranted because such use qualifies as "avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. Designating minors, and obtaining their signatures, for trusts used to hide money for tax-evasion purposes falls squarely within the "avoiding detection of" category. The trusts were used by Sharon Hopkins to evade taxes. By her affirmatively engaging minors to sign the trusts as beneficiaries, she "used" the minors' involvement to provide an appearance of legitimacy to the trusts, and thereby hide the true purpose of the trusts. Finally, Mark Hopkins's objection to this enhancement is not properly before the court. See infra p. 41.

27

whether a defendant is a leader or organizer:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

Id. cmt. n.4. In order to qualify as a leader, some "element of control over underlings" is required. United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009). Because of the disjunctive usage of "or," however, no such requirement is necessary to qualify as an organizer. United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009). A defendant may qualify as an organizer under § 3B1.1 for "'devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants.'" Wardell, 591 F.3d at 1304 (quoting United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997)).

Here, the district court found this enhancement was warranted because "Sharon Hopkins was in charge of the finances[,] . . . was paid $6500 a month . . . to handle the business[,] . . . set up or was one of the organizers of at least one of the trusts[,] . . . kept the books[,] . . . signed multiple checks[, and] . . . incorporated at least one of the entities here." R. Suppl. Vol. 1, at 18. In light of

28

this conduct, the district court concluded that Sharon Hopkins's role was "equal to the role of her husband" and warranted an enhancement. Id. at 18-19.

Sharon Hopkins argues that the district court erroneously concluded she was an organizer or leader in the tax-evasion scheme because she did nothing more than help her husband in his scheme. As support, she cites testimony that Mark Hopkins "took the lead" because he researched the tax code, directed his paychecks to one of the trusts, sent letters to the IRS, and met with IRS agents. Aplt. S.H. Br. at 34-35.

Without disputing the above, the government cites numerous portions of the record as evidence of Sharon Hopkins's extensive involvement in and organization of the tax-evasion scheme. Specifically, Sharon Hopkins organized and managed the trust entities, maintained the funds in those entities by transferring funds between accounts, and created some of the entities. Sharon Hopkins wrote over 90% of the checks from these trust accounts. Moreover, despite her contentions otherwise, Sharon Hopkins was involved in the decision to stop paying taxes: she communicated with the tax-protester groups, attended meetings, and read the literature. She also purchased the tax-evading trusts. R. Vol. 3 pt. 5, at 623; id. pt. 3, at 201-03; Aplee. Addendum Vol. 1, ex. 55. While Mark Hopkins researched the law and communicated with the IRS, Sharon Hopkins testified that she "was the one who implemented [the trusts]," "t[ook]

care of this type of business[, a]nd . . . made the decision."[12]  R. Vol. 3 pt. 3, at 200-01.

Sharon Hopkins does not dispute the extent of her involvement, as described above, in organizing the trusts and finances used to implement Defendants' tax-evasion scheme.  Rather, she disputes the conclusion drawn from such involvement.  R. Suppl. Vol. 1, at 15 ("[A]gain, this is a situation where the facts are not so much the issue as is what the conclusions that were drawn from them.").  The district court determined that her involvement and management of the trusts and finances warranted enhancement under this provision.  All of these conclusions are supported by the record.  See Wardell, 591 F.3d at 1304 ("[A] defendant's status as an organizer or leader involves a sophisticated factual determination[ by the] district court.").  Accordingly, the district court did not err by enhancing Sharon Hopkins's sentence for her role in the tax-evasion scheme.

---

[12]  Sharon Hopkins attempts to counter her involvement by characterizing herself as simply an administrator for her husband's scheme.  The portions of the record she cites as support for this claim do not stand for the proposition asserted.  As examples of her lack of understanding the tax-evasion scheme, she claims to have no knowledge of Oregon nonprofit law or "how registered agents worked." Aplt. S.H. Br. at 36.  The portions of the record cited as support for these contentions indicate that she had no knowledge why the legislature would create a certain nonprofit law and did not know of geographic restrictions regarding where a registered agent was located.  R. Vol. 3 pt. 3, at 289, 291-92.  Accordingly, her attempts to cast herself as the unknowing assistant are simply not supported by the record.

III

Mark Hopkins's sole issue on appeal is whether the district court erroneously applied the offense level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Mark Hopkins offers three different bases for concluding that the district court's application of this enhancement was erroneous: the district court based this enhancement on the jury's guilty verdict; the district court double counted conduct for the offense level and enhancement; and, the district court relied on Mark Hopkins's bankruptcy filing as a basis for enhancement in violation of his right to petition the government under the First Amendment.

*Obstruction of Justice Enhancement*

At sentencing, the district court adopted the factual findings and conclusions in the PSR in full, including enhancement for obstruction of justice. Mark Hopkins did not object to the factual findings in the PSR, but did object to the application of this enhancement. The PSR relied on the following bases for enhancement: (1) the creation and use of trust accounts to impede the IRS's tax collection efforts; (2) threatening letters sent to IRS agents by Mark Hopkins to prevent tax collection; (3) federal law suits filed by Mark Hopkins against IRS agents and government officials to prevent tax collection, all of which were ultimately dismissed as frivolous; (4) failure to pay quarterly tax payments pursuant to pretrial release conditions as directed by the district court; and (5)

31

misrepresenting financial information to the probation office for the PSR regarding Mark Hopkins's trust accounts. In an addendum to the PSR, the government offered as an additional basis for enhancement Mark Hopkins's testimony at trial that he and his wife had a good faith belief that they were not required to pay federal income tax. Addendum, R. Vol. 2, at 2. Mark Hopkins objected to this additional basis in the Second Addendum arguing that "a jury's verdict cannot be the basis for such an enhancement." Second Addendum, R. Vol. 2, at 3.

> The two-level enhancement for obstruction of justice applies when
>
> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. The commentary includes the following examples of obstructive conduct: "providing materially false information to a probation officer in respect to a presentence or other investigation for the court"; and, "committing, suborning, or attempting to suborn perjury." Id. cmt. n.4(B), (H). A false statement or incomplete or misleading information to law enforcement, when not under oath, will not constitute obstruction under this enhancement unless the information was materially false and significantly obstructed or impeded an official investigation or prosecution for the instant offense. Id. cmts.

32

n.4(G), n.5(B).  Moreover, "incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation," does not amount to obstruction under this section.  Id. cmt. n.5(C).  "Material," as used in this section, means "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  Id. cmt. n.6.

### 1) Jury Verdict

Mark Hopkins first argues the enhancement was not justified because it was based on conflicts between his testimony at trial and the jury's guilty verdict, which "cannot provide a basis for an obstruction enhancement under Section 3C1.1."  Aplt. M.H. Br. at 10-11.

When perjured testimony is the basis for the enhancement under this provision, the district court must make certain findings before enhancement is appropriate.  Specifically, the district court must find all three elements of perjury:  1) a false statement under oath, 2) concerning a material matter, 3) with the willful intent to provide false testimony.  United States v. Dunnigan, 507 U.S. 87, 94 (1993) abrogated on other grounds, United States v. Wells, 519 U.S. 482 (1997).  Additionally, this circuit "require[s] that a district court be explicit about which representations by the defendant constitute perjury[,]" because "[this c]ircuit's standards are stricter than those expressed in Dunnigan."  United States v. Hawthorne, 316 F.3d 1140, 1146 (10th Cir. 2003).  Accordingly, a district court must specifically find that the defendant committed perjury before

33

enhancement is warranted when based on the defendant's allegedly perjured

testimony at trial.

Here, however, the district court did not base the enhancement on Mark

Hopkins's testimony at trial.[13]  In the Addendum to the PSR, the government cited

as an additional basis for enhancement Mark Hopkins's trial testimony that he had

a good faith belief that he was not required to pay taxes, which the government

contended was rejected by the jury.  As the basis for this enhancement, however,

the district court adopted the findings and conclusions of paragraph 53 (outlining

the original bases for obstruction) of the PSR, which did not include the allegedly

perjured testimony.  The district court did not reference or make explicit findings

of the perjury alleged in the Addendum.  Neither the government nor defense

---

[13]  This distinguishes the present case from those cited by Mark Hopkins,
where enhancement was based on perjured trial testimony.  Aplt. M.H. Br. at
10-11 (citing United States v. Alvarado-Guizar, 361 F.3d 597, 600-01 (9th Cir.
2004) (analyzing enhancement for perjury); United States v. Monzon-Valenzuela,
186 F.3d 1181, 1183-84 (9th Cir. 1999) (reversing district court's enhancement
for "testifying falsely at trial" when no independent finding was made by district
court); United States v. Garcia-Guizar, 160 F.3d 511, 524-25 (9th Cir. 1998)
(overruling district court's enhancement based on the defendant's allegedly
perjured trial testimony); United States v. Shannon, 137 F.3d 1112, 1119 & n.3
(9th Cir. 1998) (affirming application of enhancement because the defendant
"perjur[ed] [herself] on the witness stand"), overruled on other grounds by United
States v. Heredia, 483 F.3d 913, 921-22 (9th Cir. 2007); United States v.
Markum, 4 F.3d 891, 897-98 (10th Cir. 1993) (reversing enhancement based on
allegedly perjured testimony during trial); United States v. Cunavelis, 969 F.2d
1419, 1423 (2d Cir. 1992) (same); United States v. Akitoye, 923 F.2d 221, 228-29
(1st Cir. 1991) (affirming district court's enhancement based on belief that
defendant perjured himself during trial by testifying to "'cock and bull story'").

counsel raised the issue at sentencing. Rather, the district court based this enhancement on additional obstructive conduct before and after trial, such as sending threatening letters to IRS agents during its investigation, failing to pay quarterly taxes pursuant to court order, filing frivolous lawsuits, and providing material financial misinformation to the probation office during its post-trial investigation. See R. Suppl. Vol. 1, at 83 (adopting the factual findings and reasoning in the PSR for enhancement and making note of Mark Hopkins's failure to pay quarterly taxes as previously ordered by the district court). While he correctly notes that conflict between his testimony and the jury verdict would not constitute a basis for an obstruction enhancement, independent obstructive conduct served as the basis for enhancement here, not allegedly perjured testimony. See Markum, 4 F.3d at 897 ("An automatic finding of untruthfulness, based on the verdict alone, would impinge upon the constitutional right to testify on one's own behalf."). Consequently, the district court's enhancement of Mark Hopkins's sentence for obstruction was well supported.

### 2) Double Counting

Mark Hopkins next contends application of this enhancement amounted to impermissible "double counting" of his conduct for both the underlying offense and the enhancement. Aplt. M.H. Br. at 11. Additionally, he argues that the district court erroneously relied on conduct before the IRS's investigation began in 2006 and that his failure to pay estimated taxes during the pendency of trial

was also erroneously considered.  Id. at 12-13, 15.

Generally, impermissible "[d]ouble counting occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Reyes Pena, 216 F.3d 1204, 1209 (10th Cir. 2000) (quotation omitted).  "Of course, if a particular guideline specifically speaks to double counting, such an instruction [is] [] controlling." United States v. Coldren, 359 F.3d 1253, 1256 (10th Cir. 2004).

Comment 7 to § 3C1.1, titled "Inapplicability of Adjustment in Certain Circumstances," states,

> If the defendant is convicted for an offense covered by § 2J1.1 (Contempt), § 2J1.2 (Obstruction of Justice), § 2J1.3 (Perjury or Subornation of Perjury; Bribery of Witness), § 2J1.5 (Failure to Appear by Material Witness), § 2J1.6 (Failure to Appear by Defendant), § 2J1.9 (Payment to Witness), § 2X3.1 (Accessory After the Fact), or § 2X4.1 (Misprision of Felony), this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense).

U.S.S.G. § 3C1.1 cmt. n.7.  Initially, we note that tax evasion and conspiracy to defraud the government are not included in the enumerated crimes listed in this comment.  Moreover, application of this enhancement has been affirmed in similar circumstances, and determined to not be impermissible double counting,

36

based on tax-evasion offense conduct because efforts to prevent the government from discovering tax evasion constituted a "separate and distinct" harm from the "obstruction of the collection of revenue." United States v. Sabino, 307 F.3d 446, 450-51 (6th Cir. 2002); see also United States v. Uscinski, 369 F.3d 1243, 1247-48 (11th Cir. 2004). Here, moreover, the district court relied on conduct beyond offense conduct as the basis for enhancement.

The district court enhanced Mark Hopkins's sentence for obstruction of justice based on the following conduct: he submitted a post-trial financial assessment for the PSR that misrepresented to the probation office his financial information by stating that no accounts were associated with the Maranatha Trust despite trial evidence that $23,400 was transferred to that trust; during the investigation, he sent threatening letters to IRS Special Agent Jennifer Hand; he filed two frivolous tax suits[14] and frivolous tax returns; and he failed to follow the

---

[14] The first suit was filed while the IRS's investigation was ongoing and sought to quash a summons served by the IRS on a bank seeking Defendants' financial records. The district court dismissed this suit for failure to state a claim after concluding that Defendants' "typical tax protestor arguments" were "wholly unsupported by the law." Hopkins v. Internal Revenue Serv., No. 07-262 JH, 2008 WL 2079151, at *6 (D.N.M. Mar. 28, 2008), aff'd 318 F. App'x 703, 706 (10th Cir. 2009) (determining "no merit to the issues raised by the [Hopkinses]"). In the second suit, filed in February 2009, Defendants sued the Attorney General and Secretary of State seeking an injunction preventing the IRS's criminal investigation and enforcement and asserting broadly that the tax code violates the constitution. Hopkins v. Clinton, No. 1:09-cv-00185-JCH-CG (D.N.M. Oct. 30, 2009), ECF 11 (dismissing the second suit for failure to state claim and failure to effectuate service of process on the defendants).

37

district court's order to pay quarterly tax payments for estimated taxes citing the automatic stay imposed after Defendants filed for Chapter 13 bankruptcy to avoid tax liabilities. R. Vol. 2, at 22-23. The frivolous tax returns and threats to "IRS Revenue Officer P.F." and the IRS Regional Director were listed as overt acts in the indictment, but the frivolous civil suits and threats against IRS Special Agent Jennifer Hand were not. R. Vol. 1 pt. 1, at 5-6; R. Vol. 3 pt. 9, at 1006-11; Aplee. Addendum Vol. 2, ex. 340. Moreover, the post-trial financial misrepresentation to the probation office regarding the Maranatha Trust was material because the probation office was investigating Mark Hopkins's finances for PSR purposes, which could affect restitution orders at sentencing. See United States v. Shetty, 130 F.3d 1324, 1335 (9th Cir. 1997) ("[I]n a tax case, money is material evidence." (alteration in original) (quotation omitted)). Mark Hopkins also filed pro se suits after the investigation began asserting legal theories that he had previously been informed were frivolous, one of which delayed the government's efforts to summons financial records for an eighteen-month period during the IRS's investigation. R. Vol. 3 pt. 9, at 1017; Aplee. Addendum Vol. 2, ex. 342. The district court found this non-offense conduct supported enhancement and did not impermissibly double count offense conduct as the basis for enhancement.

### 3) Bankruptcy Filing

Finally, Mark Hopkins argues the district court's reliance on his bankruptcy

filing as conduct warranting enhancement for obstruction violates his constitutional right to petition the government under the First Amendment. Aplt. M.H. Br. at 13. Specifically, Mark Hopkins contends that he has "a constitutional . . . right to file [a] bankruptcy petition[] and that [his] exercise of this protected right cannot be used as a basis for an obstruction enhancement under Section 3C1.1." Id. at 14. The district court adopted the PSR's conclusion that Mark Hopkins filed for bankruptcy to trigger the automatic stay and prevent tax collection efforts. R. Vol. 2, at 22.

The First Amendment's guarantee of free speech includes the right to petition the courts for redress. United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967). This right is not boundless: "As the government correctly points out, [this right] provides no protection for knowingly fraudulent or frivolous claims." United States v. Ambort, 405 F.3d 1109, 1117 (10th Cir. 2005). "Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 743 (1983) (citations omitted).

Before Mark Hopkins filed, pro se, for bankruptcy in 2010, he had already filed, also pro se, two civil suits based on the same tax-protester beliefs that the courts found meritless. Mark Hopkins had also previously filed for Chapter 13 bankruptcy, which he voluntarily dismissed in response to a motion seeking

39

dismissal and sanctions for "filing the case for the purpose of litigating tax protestor arguments." See R. Vol. 3 pt. 8, at 1378-79 (asking that the bankruptcy court "send a strong message to others who might decide to use the bankruptcy courts as a shelter from their legal obligations"); Aplee. Addendum Vol. 2, ex. 200. See Collins, 920 F.2d at 629 (rejecting the same tax protester arguments as "silly" and "frivolous"). And Mark Hopkins voluntarily dismissed his 2010 Chapter 13 bankruptcy case just two months after filing the petition.

The district court's consideration of Mark Hopkins's failure to pay estimated quarterly taxes due to the bankruptcy filing did not infringe on his First Amendment rights because the First Amendment does not protect frivolous claims. See Ambort, 405 F.3d at 1117 (concluding that tax protesters' "claim[] that they were actually pursuing in good faith what they believed was the proper procedure[, by filing suit asserting frivolous tax protestor claims,] to attempt to evade the consequences of their intentional and knowing fraud does not somehow bring their conduct within the First Amendment's protection").

Regardless, the obstruction enhancement was based on multiple instances of conduct that would independently qualify for enhancement—such as the threatening letters to Agent Hand and the post-trial, financial misinformation to the probation office. Accordingly, the district court did not err by enhancing Mark Hopkins's sentence for obstruction of justice.

IV

For the foregoing reasons, we AFFIRM the district court's denial of Sharon Hopkins's motion to dismiss the indictment. We also AFFIRM the sentences of both Sharon Hopkins and Mark Hopkins.

Mark Hopkins has also filed a motion for leave to file a pro se reply brief. Because he is represented by counsel who previously submitted a brief on his behalf, his motion for leave to file a pro se supplemental brief is DENIED pursuant to this court's "policy of addressing on direct appeal only those issues raised by counsel." United States v. McDermott, 64 F.3d 1448, 1450 n.1 (10th Cir. 1995).

Entered for the Court


Mary Beck Briscoe
Chief Judge

41

Nos. 11-2114, 11-2115, United States v. Mark E. Hopkins & Sharon J. Hopkins.

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's order and judgment with the exception of the two-level sentencing enhancement applied to Defendants Dr. Mark Hopkins and Sharon Hopkins for the use of minors in the commission of the offenses. U.S.S.G. § 3B1.4. I would remand for resentencing.

The PSR suggests that the children signed a "Notice To and Acceptance By Capital Unit Certificate Holders" for 16.66 units of the Guadalupe Medical Services Trust ["GMST"] on August 9, 1997. 2 R. 7–8, ¶ 20; 21–22, ¶ 54; 7 Supp. R. 3. Prior to 1997, Dr. Hopkins worked as an independent contractor for his own subchapter S corporation, Guadalupe Emergency Medical Services ["GEMS'], and both he and the corporation filed tax returns. 2 R. 8, ¶ 22. In 1997, he changed his business from GEMS to GMST in an unsuccessful effort to avoid IRS levies against his employers. Id. at ¶¶ 22–23. Indeed, according to the PSR, this appears to be the only business for GMST. Id. at ¶ 23. In December 1998, Dr. Hopkins began working for the Schumacher Group as an independent contractor and directed that his compensation be paid to Shalom Enterprises, Inc. Id. at 8–9, ¶¶ 24–26. Some of this compensation apparently was then directed to GMST. Id. at 9, ¶ 27; 10.[1]

---

[1] Record evidence of the children's signatures appears in II Aplee. Addendum of Exhibits ("Notice To and Acceptance by Capital Unit Certificate Holders"). This document indicates the same date, units, and children identified

At the sentencing hearing, Mrs. Hopkins objected to the enhancement because there was no "actual involvement of the child in the criminal act" and the signatures on the trust documents in no way facilitated or "contributed to the commission of the crime." 1 Supp. R. 13, 11. Although she conceded she used "sophisticated means" to avoid payment, Mrs. Hopkins argued that "the use of the trust does not equate to the use of the children whose signatures may appear on those documents." Id. at 9–10; see also id. at 10–11 ("The children were not manipulated regarding anything having to do with taxes. [Children are named in trusts] time and time again every day . . . ."). Dr. Hopkins also raised an objection to the application of this enhancement at his sentencing. See 1 Supp. R. 77.[2] The district court nevertheless concluded that the minors "were noted on these trusts to facilitate and accomplish [the evasion of taxes]," and therefore applied the enhancement to both Defendants. 1 Supp. R. 14, 94. This conclusion is erroneous.

No evidence, let alone logic, suggests that the children's signatures as beneficiaries of GMST even remotely facilitated concealment of income and tax

_____

in the PSR but is apparently for the Grace Trust rather than the GMST. Because the Hopkins used the Grace Trust in the same way they used the GMST, see 2 R. 10, the analysis and conclusion remain unchanged.

[2] Although his initial briefing on appeal does not raise this argument, Dr. Hopkins filed a motion for leave to file a pro se supplemental brief to address solely this issue. This court has denied the motion. See supra Order and Judgment at Part IV.

evasion. The "use of a minor" enhancement is appropriate if "the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. As the court notes, "using" includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." Id. cmt. n.1. "Proof that the defendant and the minor participant were mere co-conspirators or confederates is not sufficient to establish this enhancement." United States v. Peña-Hermosillo, 522 F.3d 1108, 1114 (10th Cir. 2008). Neither is "mere presence" of a minor during unlawful activity. See United States v. Molina, 469 F.3d 408, 414–15 (5th Cir. 2006). Generally, courts have found the enhancement applies only where "a defendant directs, trains, or in some other way affirmatively engages the minor participant in the crime of conviction." United States v. Suitor, 253 F.3d 1206, 1210 (10th Cir. 2001). Designating a minor a trust beneficiary certainly would not qualify as facilitating the concealment of income or tax evasion—nothing suggests that these minors were empowered to direct income into or manage the trust or its distributions. See II Aplee. Addendum of Exhibits, IRS-439–51. Nor should the minors' signatures acknowledging their status as beneficiaries do so either.

To be sure, the enhancement does not require knowledge on behalf of the minor or active involvement. See United States v. Tran, 285 F.3d 934, 937–38 (10th Cir. 2002); United States v. Castro-Hernandez, 258 F.3d 1057, 1060 (9th

-3-

Cir. 2001).  Rather, the relevant inquiry is "whether [Dr. or Mrs. Hopkins] took affirmative acts to involve the minor[s] in the commission of the offense." United States v. Rivera, 248 F.3d 677, 682 (7th Cir. 2001).  This inquiry fulfills the enhancement's purpose of "protect[ing] minors as a class from being solicited, procured, recruited, counseled, encouraged, trained, directed, commanded, intimidated, or otherwise used to commit crime."  United States v. McClain, 252 F.3d 1279, 1286 (11th Cir. 2001) (quotation omitted).  Nothing suggests that Dr. or Mrs. Hopkins "used" these minors, or even that they somehow became their co-conspirators or confederates in the commission of the offenses.

The cases the court relies upon are inapposite.  For example, in Suitor, this court found the application of the enhancement appropriate where the defendant admitted that he conspired with two minors to manufacture and utter counterfeit checks and the participants testified to the instructions the defendant gave them for presenting the checks.  253 F.3d at 1210.  No such conspiracy or participation involving the minors was proven here.  In United States v. Keck, the defendant actually used his minor daughter to wire money for drug sales, thus involving her in the commission of the offense.  643 F.3d 789, 792, 800 (10th Cir. 2011).  No such use or participation exists here.  Creating a trust with minor beneficiaries simply is not tantamount to involving minors in the commission of a crime.

Nor is it tantamount to using the minors to avoid detection.  See, e.g., United States v. Mata, 624 F.3d 170, 175 (5th Cir. 2010) (holding that a

defendant who brings along a minor during the commission of a crime as a diversionary tactic is subject to the enhancement). Nothing indicates that the Hopkins used their children to avoid being held responsible for tax evasion after the trust was created. At best, the trust—not the children—may have lowered suspicions or concealed the movement of funds. The court's Order and Judgment opinion says as much: "The *trusts* were used by Sharon Hopkins to evade taxes." Order and Judgment at 26–27 n.11 (emphasis added). The court's ipse dixit that having the minors sign an acknowledgment of their status as beneficiaries to lend legitimacy to the trusts (and hide the true purpose of the trusts) is the kind of pronouncement that ought to rest on evidence because it certainly does not rest on trust law.

The difficulty with applying the enhancement in these circumstances is that it suggests something inappropriate about naming minors as trust beneficiaries. "If Congress meant to punish persons who committed an offense that in any way *involved* a minor, it would have provided so explicitly instead of employing the 'used or attempted to use' language." United States v. Parker, 241 F.3d 1114, 1121 (9th Cir. 2001). Because application of the enhancement conflicts with the plain meaning of the guideline, I would remand for resentencing of both Dr. and Mrs. Hopkins on this issue. See United States v. Maestas, 642 F.3d 1315, 1319 (10th Cir. 2011).