UNITED STATES of America,
Plaintiff–Appellee,

v.

Leslie Lyle CAMICK, Defendant–
Appellant.

No. 14–3089.

United States Court of Appeals,
Tenth Circuit.

July 31, 2015.

Melody Brannon Evans, Federal Public Defender, Topeka, KS, (John K. Henderson, Jr., Assistant Federal Public Defender, Wichita, KS, with her on the briefs), for Defendant–Appellant.

Brent I. ·Anderson, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Wichita, KS, for Plaintiff–Appellee.

Before KELLY, TYMKOVICH, and McHUGH, Circuit Judges.

McHUGH, Circuit Judge.

## I. INTRODUCTION

Leslie Lyle Camick was convicted of mail fraud, wire fraud, material false statement to the U.S. Patent Office, three counts of aggravated identity theft, and obstruction of justice, all stemming from his unlawful use of his deceased brother's name and identity. Following his conviction and sentencing, Mr. Camick was ordered to pay restitution in the amount of $15,186. On appeal, he argues the evidence was insufficient to convict him on each count. He also challenges the district court's restitution determination. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse Mr. Camick's convictions for mail fraud, wire fraud, material false statement, and aggravated identity theft, as well as portions of the restitution award. But we affirm the conviction for obstruction of justice.

## II. BACKGROUND

### A. Mr. Camick's Identity Theft

Mr. Camick, a citizen of Canada, entered the United States in July 2000 using the identity of his deceased brother, Wayne Bradly Camick. He adopted his brother's identity to avoid paying back taxes and child support in Canada and to evade the legal consequence of the permanent revocation of his Canadian driver's license due to numerous driving-while-intoxicated offenses.

To implement his change of identity, Mr. Camick obtained a copy of his brother's birth certificate [1] and a Canadian social insurance card (comparable to a U.S. social security card) in his brother's name. Mr. Camick used these documents when he entered the United States in 2000. Once in the United States, Mr. Camick obtained a Vermont driver's license bearing his photograph but the name and birth date of his brother. Mr. Camick thus assumed the identity of Wayne Bradly Camick throughout his time in the United States.

### B. Mr. Camick and Ms. Wattley's Relationship

In 2004, Mr. Camick became professionally and romantically involved with Lyn Wattley.[2] Mr. Camick and Ms. Wattley's business eventually took them to Winfield, Kansas, where they decided to buy a home. Only Ms. Wattley's money was used to purchase the home, but both her name and Wayne Camick's name were listed as the buyers on the real estate purchase contract. And both she and Mr. Camick signed the contract, with Mr. Camick's signature appearing as "WBC." The deed to the property showed Ms. Wattley and Wayne Camick as the owners.

### C. The Provisional Patent Application

In 2010, Mr. Camick and Ms. Wattley, along with machine welder Mark Nelson, began work on an idea Mr. Camick had for securing manhole covers. The three created prototypes and wrote technical descriptions of the invention in anticipation of obtaining a U.S. patent. A company Ms. Wattley owned, KaiTraxx LLC, paid the costs associated with the project.

In 2011, Mr. Camick and Ms. Wattley's relationship began to deteriorate. During

---

1. The real Wayne Bradly Camick died April 3, 1958, just four months after his December 6, 1957, birth date.

2. Until 2011, Ms. Wattley knew Mr. Camick only as Wayne Bradly Camick.

that time, Mr. Camick hired a patent lawyer and filed a provisional patent application for the locking manhole cover (the Provisional Patent Application or Application) without Ms. Wattley's knowledge. Mr. Camick filed the Application electronically under the name Wayne Camick. This Provisional Patent Application is the subject of the wire fraud, material false statement, and two of the aggravated identity theft counts against Mr. Camick.

### D. The Allegedly Stolen Truck

In the summer of 2011, Mr. Camick drove to Arizona in a 2006 GMC truck that he had paid for but that was titled and insured in Ms. Wattley's name. Ms. Wattley became concerned about having her name on the truck's title and insurance because Mr. Camick had a history of drunk driving. She wanted Mr. Camick to return the truck's Kansas license plates and to transfer title to his name. When Mr. Camick proved uncooperative, Ms. Wattley explained the situation to the Winfield County Police Department, and the police department issued a stolen vehicle report. A few days later, Mr. Camick was arrested in New Mexico for theft of the truck. Ms. Wattley then traveled to New Mexico, recovered the truck, and transferred ownership of it to an associate of Mr. Camick. After title had been transferred, Ms. Wattley called the district attorney's office in Deming, New Mexico, and requested that the theft charges against Mr. Camick be dropped. The Deming district attorney's office subsequently dropped the New Mexico charges, but the Kansas warrant for the stolen vehicle remained outstanding.

### E. The New Jersey Arrest and Discovery of Mr. Camick's True Identity

Toward the end of 2011, Mr. Camick's charade unraveled, beginning with his New Jersey arrest in October of that year.[3] While booked in a New Jersey jail, Mr. Camick was interviewed by U.S. Immigration Officer Jackey He to ascertain his immigration status. Mr. Camick signed a sworn statement in which he attested that his true and correct name was "Camick, Wayne Bradly" and responded "no" to the question whether he had used any other names. Officer He noticed several discrepancies in Mr. Camick's responses and directed him to report to the U.S. Immigration Office upon release. Mr. Camick reported to the U.S. Immigration Office as directed and eventually admitted to Officer He that his real name is Leslie Lyle Camick. Mr. Camick then signed a second sworn statement admitting he had used his deceased brother's identity to enter the United States and had assumed that identity while he resided here. He also admitted to owing back taxes and child support in Canada and to having multiple Canadian traffic offenses. Mr. Camick was then placed under arrest, and Officer He instigated removal proceedings against him.

### F. The Quiet Title Action

As a result of the arrest, Ms. Wattley discovered that the man she had known as Wayne Bradly Camick was really Leslie Lyle Camick. Ms. Wattley initiated a quiet title action to remove the name Wayne Camick from the title to the Kan-

---

3. The record is not entirely clear as to the basis for Mr. Camick's arrest. It appears that the arrest was either for driving under the influence or was the result of Mr. Camick being stopped at a DUI checkpoint where officers discovered the outstanding Kansas warrant for the stolen vehicle.

sas home. She served Mr. Camick with the petition while he was in custody at the immigration detention center in New Jersey, but he failed to respond within thirty days, as required under Kansas law. The Kansas state court therefore filed a journal entry quieting title in the property against Wayne Camick and in favor of Ms. Wattley.

More than a month after the court filed the journal entry and after having been released from custody on bond, Mr. Camick submitted a response to the quiet title action with the Kansas state court. In his response, Mr. Camick claimed he was the owner of the subject property, he had purchased it, and he was detained by immigration officials and therefore was unable to timely answer the petition and otherwise denied all of the claims in the petition. Mr. Camick signed the response "Wayne Camick" and swore that "all statements contained therein are true and correct."

The Kansas court thereafter sent Mr. Camick a letter explaining that his response did not comply with Kansas law and was untimely. The letter instructed Mr. Camick that if he wished to change anything in the case, he should speak with an attorney "to determine what rights, if any" he might have in the matter. Two months later, Mr. Camick mailed the Kansas court another letter (the Quiet Title Letter). In the Quiet Title Letter, Mr. Camick continued to identify himself as Wayne Camick and stated that he had been unable to file a timely response to the quiet title petition because he had been "wrongfully detained by Immigration and Customs Enforcement" as a result of "a falsified Police report filed by Ms. Wattley." Mr. Camick made no reference to his true identity. The Quiet Title Letter is the basis of the mail fraud charge and one aggravated identity theft charge.

### G. Mr. Camick's Civil Rights Lawsuit

Mr. Camick was indicted in this case in March 2013 and released on bond after a bond review hearing. As a condition of bond, the district court ordered Mr. Camick to "avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including ... any witnesses in this matter." The court specifically mentioned Ms. Wattley and told Mr. Camick to avoid making contact with her.

In July 2013, Mr. Camick filed a 42 U.S.C. § 1983 civil rights lawsuit in which he named as defendants Ms. Wattley and KaiTraxx, along with government officials involved in the 2011 stolen vehicle report (the Civil Rights Lawsuit). The complaint alleged constitutional and tort violations resulting from his arrest for theft of the GMC truck. Mr. Camick served each of the defendants with the complaint, including Ms. Wattley and KaiTraxx. The defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion. Mr. Camick's filing of the Civil Rights Lawsuit is the subject of the obstruction of justice charge.

### H. The Present Criminal Action

Pursuant to the Second Superseding Indictment, the Government charged Mr. Camick with one count of mail fraud based on the false information contained in the Quiet Title Letter; one count of wire fraud and one count of material false statement, both based on the false information contained in the Provisional Patent Application; three counts of aggravated identity theft predicated on the mail fraud, wire fraud, and material false statement

charges; and one count of obstruction of justice based on Mr. Camick's Civil Rights Lawsuit against Ms. Wattley. Following a three-day trial, and after the district court denied Mr. Camick's motion for judgment of acquittal, the jury convicted Mr. Camick on each of the seven counts. Mr. Camick then renewed his motion for judgment of acquittal, which the district court denied on all grounds. The district court thereafter sentenced Mr. Camick to forty-eight months' imprisonment to be followed by one year of supervised release. The court also ordered him to pay $700 to the crime victims fund and $15,186 in restitution. Mr. Camick timely appealed his convictions and the restitution award.

## III. DISCUSSION

█ Mr. Camick argues the district court erred in denying his motion for judgment of acquittal because the evidence was insufficient to convict him on all counts. He also argues the district court's restitution determination was erroneous.[4] For the reasons explained below, we reverse Mr. Camick's convictions for mail fraud, wire fraud, material false statement, and aggravated identity theft because the evidence was insufficient to support a conviction on those counts. But we affirm his conviction for obstruction of justice. We also reverse in part the district court's restitution award because the Government failed to put forward evidence showing Mr. Camick's actions of conviction caused many of the alleged losses to the victim, Ms. Wattley.[5]

### A. Sufficiency of the Evidence

█ Mr. Camick argues the evidence was insufficient to convict him of mail fraud, wire fraud, material false statement, aggravated identity theft, and obstruction of justice and therefore asks that we reverse each of his convictions. We review challenges to the sufficiency of the evidence and denials of motions for judgment of acquittal de novo, viewing the evidence in the light most favorable to the Govern-

4. In his opening brief, Mr. Camick raised three additional arguments: that the mail fraud and obstruction of justice convictions fail as a matter of law because they infringe on his constitutional right of access to the courts, that the district court impermissibly admitted evidence of prior bad acts, and that the jury instruction on obstruction of justice was erroneous. But Mr. Camick withdrew these claims prior to oral argument and we do not address them further. *See Hirschfeld v. N.M. Corr. Dep't*, 916 F.2d 572, 575 n. 2 (10th Cir.1990) (declining to address appellate challenges later withdrawn).

5. Also before us is the Government's motion to seal its supplemental record on appeal. The supplemental record contains the exhibits from Mr. Camick's criminal trial, which the Government asserts include confidential information such as the Provisional Patent Application and personal identification information. The Government acknowledges that not every document in the supplemental record is confidential, but requests that we seal the supplemental record in its entirety because review or redaction would be unduly burdensome and costly. In making this wholesale request to seal, the Government overlooks our presumption in favor of the "common-law right of access to judicial records." *JetAway Aviation, LLC v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 826 (10th Cir.2014) (internal quotation marks omitted). Under this presumption, it is the burden of the party requesting sealing to show why the parties' privacy interests outweigh the public's interest in access to judicial records. We therefore deny the request to seal the supplemental record and issue an order to show cause instructing the parties to identify which portions of the supplemental record should be sealed and why the interest in sealing each document overcomes the presumption in favor of public access. We reserve judgment on this matter pending resolution of the order to show cause.

ment to determine whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Porter,* 745 F.3d 1035, 1050 (10th Cir.2014) (internal quotation marks omitted). But "we do not weigh conflicting evidence or consider witness credibility, and the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient." *Id.* (alterations and internal quotation marks omitted).

### 1. Mail Fraud

■■■ We turn first to Mr. Camick's conviction for mail fraud. To support this conviction, the Government was required to present evidence showing beyond a reasonable doubt that, in mailing the Quiet Title Letter to the Kansas state court, Mr. Camick (1) devised or intended to devise a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretense or representations, (2) acted with specific intent to defraud, and (3) used the mails to carry out the fraudulent scheme. *See* 18 U.S.C. § 1341; *Porter,* 745 F.3d at 1050. In regard to the first element, it is now settled that, by including the phrase "obtain money or property," Congress intended to limit the reach of mail fraud "to the protection of property rights." *Skilling v. United States,* 561 U.S. 358, 402, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (quoting *McNally v. United States,* 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)); *see also id.* at 408–09, 130 S.Ct. 2896 (interpreting 18 U.S.C. § 1346 as permitting mail and wire fraud statutes to reach bribes and kickbacks); *United States v. Kalu,* 791 F.3d 1194, 1203, 2015 WL 3939007, at *6 (10th Cir. June 29, 2015) ("[Section] 1341 contains a single offense and does not separately prohibit a

'scheme or artifice to defraud' and a scheme or artifice 'for obtaining money or property by means of false or fraudulent pretenses.' "). The Supreme Court has also clarified that "materiality of falsehood is an element of . . . mail fraud." *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

■■■ Mr. Camick does not dispute the use-of-the-mails or property elements of mail fraud; instead, he argues the evidence was insufficient to show he made materially false representations in the Quiet Title Letter with the intent to defraud. Specifically, Mr. Camick asserts that because the Kansas court and Ms. Wattley knew as of the date of the Quiet Title Letter that his real name was Leslie Lyle Camick and because he had been known as Wayne throughout his time in the United States, his use of the name Wayne Camick was neither false nor material. He also insists the "wrongfully detained" statement was immaterial because it would have no bearing on the Kansas state court's decision to uphold or set aside the default judgment.

■■■ We agree with Mr. Camick that neither his use of the name Wayne Camick nor his claim to being wrongfully detained was material. A statement is material for purposes of mail fraud if it "has a natural tendency to influence, or is capable of influencing a decision or action by another." *United States v. Sharp,* 749 F.3d 1267, 1279 (10th Cir.2014) (internal quotation marks omitted). "The question of whether a statement is material is a question of fact for the jury to decide." *Id.* (internal quotation marks omitted). Under this materiality analysis, the jury must determine "at least two subsidiary questions of purely historical fact: (a) 'what statement was

made?' and (b) 'what decision was the [decisionmaking body] trying to make?'" *United States v. Schulte*, 741 F.3d 1141, 1154 (10th Cir.2014) (quoting *United States v. Gaudin*, 515 U.S. 506, 512, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)). After answering these two questions, the jury must determine whether the relevant statement could influence the relevant decision. *See, e.g., United States v. Schuler*, 458 F.3d 1148, 1152–53 (10th Cir.2006) (concluding that statements in mailed advertisements for credit and financial services were material because they were "likely to induce customers to send [defendant] money"); *United States v. Lawrence*, 405 F.3d 888, 901 (10th Cir.2005) (holding that the fraudulent use of a doctor's provider number and the misuse of Medicare service codes in Medicare reimbursement forms were material because they would "have a natural tendency to induce [a Medicare] payment").

Turning to the facts underlying Mr. Camick's mail fraud conviction, we must determine whether the relevant statements, i.e., Mr. Camick's use of the name Wayne Camick and his claim to being "wrongfully detained" in the Quiet Title Letter, were capable of influencing the relevant decision, i.e., the Kansas state court's decision to grant or deny Mr. Camick's request to set aside the default judgment. We conclude that neither of Mr. Camick's misrepresentations was capable of influencing the Kansas state court's decision.

■ Under Kansas law, a court may set aside a default judgment if the conditions of section 60–260(b) of the Kansas Code are met. *See* Kan. Stat. Ann. § 60–255(b) ("The court may set aside a default judgment under subsection (b) of K.S.A. 60260 . . . ."). The Kansas Supreme Court

has explained that section 60–260(b) requires a party seeking to set aside a default judgment to show "(1) that the non-defaulting party will not be prejudiced by the reopening, (2) that the defaulting party has a meritorious defense, and, (3) that the default was not the result of inexcusable neglect or a willful act." *State ex rel. Stovall v. Alivio*, 275 Kan. 169, 61 P.3d 687, 690 (2003) (internal quotation marks and emphasis omitted). It is the burden of the defaulting party to "plead and prove" that these conditions are met. *See Canaan v. Bartee*, 272 Kan. 720, 35 P.3d 841, 849 (2001). Thus, in order for the misstatements in the Quiet Title Letter to have been capable of influencing the Kansas state court to set aside the default judgment, those misstatements must have been targeted at proving one of these three conditions.

■ Looking first to Mr. Camick's use of the name Wayne Camick, this misstatement appears most relevant to the second of the above-listed conditions: whether the defaulting party has a meritorious defense. To satisfy this condition, Mr. Camick was required to show "there was some reasonable possibility [he] would have enjoyed a different outcome from the trial if [his] participation had precluded default judgment." *Landmark Nat'l Bank v. Kesler*, 289 Kan. 528, 216 P.3d 158, 163–64 (2009).

Although Mr. Camick could have conceivably included the name Wayne Camick in the Quiet Title Letter in an effort to show a meritorious defense, nothing in the Letter indicates he used the name in such a manner. Instead, he merely indicated in the Letter that he was "named on Title [to the Winfield property] as 'Wayne Camick'" and signed the Letter in the name Wayne Camick. Neither of these references demonstrates an intent to persuade

the court that Wayne was in fact Mr. Camick's legal name or that the allegations in the quiet title petition were otherwise false. And because the Kansas state court was well aware of Mr. Camick's real identity and knew he had gone by the name Wayne throughout his time in the United States, Mr. Camick's continued use of that name, without· more, was insufficient to show a meritorious defense. It was therefore immaterial to any decision of the Kansas court.

Mr. Camick's claim to being "wrongfully detained" was likewise immaterial. It is reasonable to assume Mr. Camick included this misrepresentation in the Quiet Title Letter in an effort to show excusable neglect, the third condition Kansas courts consider when deciding whether to set aside a default judgment. But such a claim would not satisfy Kansas's excusable neglect standard. In determining whether a defaulting party has demonstrated excusable neglect, Kansas courts generally consider whether the defaulting party received proper notice of the lawsuit. *Stovall*, 61 P.3d at 691. For example, in *Montez v. Tonkawa Village Apartments*, the Kansas Supreme Court reversed a trial court's denial of an apartment complex's motion to set aside default judgment because, although the apartment manager had received service of process, he neglectfully failed to notify the principals of service. 215 Kan. 59, 523 P.2d 351, 353, 356 .(1974).

 Kansas courts also look to whether the party's failure to timely respond "reflects neglectful indifference or reckless indifference." *Canaan*, 35 P.3d at 849. If so, the motion to set aside a default judgment should be denied. *See Tyler v. Cowen Constr., Inc.*, 216 Kan. 401, 532 P.2d 1276, 1281 (1975) ("Inadvertent neglect, in our opinion, is not to be equated with excusable neglect. As we understand these terms, . . . inadvertently means inattentively, carelessly, heedlessly, while excusable means justifiable, pardonable, allowable, defensible.").

 Here, Ms. Wattley properly served Mr. Camick with the petition to quiet title while he was incarcerated. Shortly thereafter, she visited Mr. Camick at the New Jersey detention center, and he indicated to her that he planned to respond. Having full knowledge of the quiet title action and his deadline for responding, Mr. Camick was thus required to demonstrate to the court that his conduct in not responding was "justifiable, pardonable, allowable, [or] defensible," as opposed to simply "inattentive[ ], careless[ ], [or] heedless[ ]." *Id.*

 We conclude that the "wrongfully detained" statement does not satisfy this standard. Even if Mr. Camick hoped this statement would convince the court to reopen the quiet title action, he was mistaken. The fact of his detention—either rightful or wrongful—would not, standing alone, establish excusable neglect. Indeed, parties frequently participate in legal matters while incarcerated,· *see, e.g., State v. Randall*, 257 Kan. 482, 894 P.2d 196, 198 (1995) (ruling on a motion filed by a pro se prisoner); *State v. Buddenhagen*, 178 P.3d 80, No. 98,197, 2008 WL 713739, at *1 (Kan.Ct.App. Mar. 14, 2008) (unpublished table decision) (involving an imprisoned defendant who filed a response to paternity petition),[6] and courts routinely

---

6. "Although we are not required to follow the dictates of an intermediate state appellate court, we may view such a decision as persuasive as to how the state supreme court might

deny motions to set aside default judgments based on claims of being incarcerated, rightfully or otherwise, *see, e.g., In re ARW*, 343 P.3d 407, 412–13 (Wyo.2015) (affirming denial of motion to set aside default judgment of defendant who had been incarcerated and was being transferred to new facility during time for responding to lawsuit because he failed to show how his incarceration and transfer prevented him from responding); *Doe v. Hamilton*, 202 S.W.3d 621, 623 (Mo.Ct. App.2006) (finding a defaulting party's assertion that his incarceration in federal prison had limited his ability to defend a civil case "lacking merit" and therefore denying motion to set aside default judgment); *Whitt v. Farmer's Mut. Relief Ass'n*, 815 N.E.2d 537, 539–41 (Ind.Ct.App. 2004) (affirming denial of a motion to set aside default judgment where defaulting party claimed he had been "wrongfully imprisoned and unable to respond" because the motion was not filed within a reasonable time).

Because Mr. Camick made no attempt to explain to the Kansas state court how his incarceration impaired his ability to respond to the quiet title petition, his claim to being "wrongfully detained" was not capable of persuading the court that his inaction was the result of excusable neglect. This misrepresentation was therefore immaterial to the court's decision to grant or deny Mr. Camick's request to set aside the default judgment.

Accordingly, we conclude that neither Mr. Camick's use of the name Wayne Camick nor his claim to being "wrongfully detained" in the Quiet Title Letter was capable of influencing a decision of the Kansas state court. Those misstatements were therefore immaterial, and because materiality is an essential element of mail fraud, we reverse Mr. Camick's conviction for mail fraud.

### 2. Wire Fraud and Material False Statement

■ Mr. Camick next challenges his convictions for wire fraud and material false statement, both of which were premised on the false information Mr. Camick included in the Provisional Patent Application. To sustain a conviction for wire fraud in violation of 18 U.S.C. § 1341, the Government was required to show that, in submitting the Provisional Patent Application, Mr. Camick (1) devised or intended to devise "a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises;" (2) with "an intent to defraud;" and (3) used "interstate wire communications to execute the scheme." *Porter*, 745 F.3d at 1051 (alterations and internal quotation marks omitted); 18 U.S.C. § 1343. Materiality of the falsehood is also a required element of wire fraud. *United States v. Ransom*, 642 F.3d 1285, 1289–90 (10th Cir. 2011). Similarly, to prove Mr. Camick made a false statement to the Patent and Trademark Office (PTO) in violation of 18 U.S.C. § 1001(a)(3), the Government was required to show "(1) [Mr. Camick] made a statement; (2) the statement was false, fictitious, or fraudulent as [Mr. Camick] knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material." *United States v. Harrod*, 981 F.2d 1171,

rule." *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 n. 1 (10th Cir.2013) (internal quotation

marks omitted).

1175 (10th Cir.1992) (internal quotation marks omitted).

■ Mr. Camick argues that because he was the actual inventor of the locking manhole cover and everyone knew him as Wayne Camick, his use of that name on the Provisional Patent Application is insufficient to demonstrate a false statement with an intent to defraud. He further contends that, even if the use of the name Wayne Camick constituted a fraudulent statement, it was immaterial. We agree that regardless of whether the Provisional Patent Application contained false statements, those statements were not material, and we therefore reverse his convictions for wire fraud and material false statement.

■ As with mail fraud, materiality in the wire fraud and material false statement contexts means that the false statement "has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gordon,* 710 F.3d 1124, 1148 n. 26 (10th Cir.2013) (internal quotation marks omitted) (wire fraud); *Schulte,* 741 F.3d at 1154 (material false statement). We therefore must again determine whether the relevant statements were capable of influencing the relevant decision. *Schulte,* 741 F.3d at 1154.

As to the relevant statement, the Second Superseding Indictment charged that Mr. Camick committed wire fraud through "emails and a provisional patent application for U.S. patent in which [Mr. Camick] represented himself to be his deceased brother, Wayne Bradly Camick, using the name 'Wayne Camick' and the initials 'WBC.'" The Second Superseding Indictment also charged him with material false

statement to the PTO based on the allegation that "he concealed his true identity and applied for a provisional United States patent under the name of his brother, who died as [an] infant, Wayne Bradly Camick, using the name 'Wayne Camick' and the initials 'WBC.'" Thus, the statements that formed the basis of the wire fraud and material false statement charges are Mr. Camick's use of the name "Wayne Camick" and signature "WBC" on the Provisional Patent Application.

Next, we must identify the decision to be made by the relevant decisionmaking body, in this case the PTO. To do so, we look to the statutes, regulations, and guidance documents governing provisional patent applications. In its Manual of Patent Examining Procedure, the PTO describes a provisional patent application as a "quick[ ] and inexpensive[ ]" filing that serves as a placeholder with the PTO and that grants the applicant "the benefit of priority" for an invention. U.S. Patent & Trademark Office, *Manual of Patent Examining Procedure* § 201.04 (9th ed.2014) [hereinafter MPEP], *available at* http://www.uspto.gov/web/offices/pac/mpep/mpep–0200.pdf; *see also* 35 U.S.C. § 111(b) (describing the requirements of a provisional patent application); *id.* § 119(e)(1) (granting provisional patent applications the benefit of priority); 37 C.F.R. § 1.51 (describing the contents of a provisional patent application).

Notably, a provisional patent application does not require an oath or declaration by the applicant and "will not be examined for patentability." MPEP § 201.04. If the applicant takes no action within one year of filing the provisional application, the application will be deemed abandoned and "shall not be subject to revival." 35 U.S.C. § 111(b)(5). The applicant may,

however, take additional action during that one-year period to either convert a provisional patent application into a nonprovisional application, 37 C.F.R. § 1.53(c)(3), or to incorporate a provisional application into a subsequently filed nonprovisional application by reference, 35 U.S.C. § 119(e)(1). Therefore, the information contained in a provisional application will only become relevant to a PTO decision if the applicant takes additional action on the application within one year of filing.

Accordingly, statements in a provisional patent application, without additional action on the part of the applicant, cannot "influenc[e] ... the decision of the decisionmaking body to which it was addressed," *Gordon*, 710 F.3d at 1148 (internal quotation marks omitted), because, at the time an applicant files a provisional patent application, there is no decision to be made. Although a provisional application could later inform a decision of the PTO based on additional action taken by the applicant, the applicant could just as likely abandon the provisional application through inactivity. Unless and until an applicant takes the additional steps necessary to convert or incorporate the provisional patent application into a nonprovisional application, any statements contained in the provisional application will not be reviewed by the PTO. As a result, those statements are incapable of influencing a PTO decision and are therefore immaterial. *Cf. Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1367 n. 7 (Fed.Cir. 2008) (concluding in a patent enforceability suit that inaccurate statements in a provisional patent application did not provide clear and convincing evidence of deceptive intent because "provisional applications are not examined and ... the alleged misrepresentation here was corrected prior to examination of the nonprovisional applications").

In this case, Mr. Camick filed the Provisional Patent Application in 2011, but then failed to take additional action, thereby abandoning it. The PTO therefore had no reason or opportunity to review Mr. Camick's Provisional Patent Application and it could not have influenced a PTO decision. Thus, the statements in the Application were immaterial. Because the Government's evidence fails to establish materiality, we reverse Mr. Camick's convictions for wire fraud and material false statement.

### 3. Aggravated Identity Theft

Mr. Camick next challenges the sufficiency of the evidence on the three aggravated identity theft convictions. The aggravated identity theft statute prohibits "knowingly transfer[ing], possess[ing], or us[ing], without lawful authority, a means of identification of another person" "during and in relation to" any of the enumerated felonies, including mail fraud, wire fraud, and material false statement. 18 U.S.C. § 1028A(a)(1), (c)(4), (5). Thus, a conviction for aggravated identity theft is predicated on the commission of one of the enumerated felonies. Because we have reversed Mr. Camick's convictions for mail fraud, wire fraud, and material false statement, we necessarily reverse each of his aggravated identity theft convictions, which were premised on those now-reversed convictions.

### 4. Obstruction of Justice

█ Finally, Mr. Camick argues the evidence was insufficient to support his conviction for obstruction of justice based on his filing of the Civil Rights Lawsuit

against Ms. Wattley. Although Mr. Camick originally challenged the legal sufficiency of his obstruction of justice conviction as well, arguing the conviction violated his constitutional right to petition the courts, he voluntarily withdrew this legal challenge. We therefore review only whether the evidence was sufficient to support a conviction for obstruction of justice and express no opinion on Mr. Camick's subsequently withdrawn constitutional argument.

 The particular obstruction of justice offense for which Mr. Camick was convicted prohibits "knowingly, with the intent to retaliate, tak[ing] any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense." 18 U.S.C. § 1513(e).[7] Thus, to sustain a conviction for obstruction of justice under § 1513(e), the Government was required to show (1) Mr. Camick knowingly took an action with intent to retaliate, (2) his action harmed Ms. Wattley (emotionally, economically, or otherwise), and (3) his retaliation was motivated by Ms. Wattley's cooperation with law enforcement. *United States v. Stoker*, 706 F.3d 643, 646, 648 (5th Cir. 2013). Mr. Camick's sole argument on

appeal is that the Government's evidence was insufficient to show he filed the Civil Rights Lawsuit with a retaliatory intent.

[21] Proving intent is often a difficult task; therefore, courts do not "require[ ] the government to produce a 'smoking gun' that explicitly reveals the contents of defendant's mind." *United States v. Ashley*, 606 F.3d 135, 140–41 (4th Cir.2010). Instead, intent "may be proven via circumstantial evidence; in fact, it is rarely established by other means." *United States v. Nguyen*, 413 F.3d 1170, 1175 (10th Cir. 2005); *see also Ashley*, 606 F.3d at 140 ("Direct evidence of retaliatory intent is usually unavailable to prosecuting attorneys." (internal quotation marks omitted)).

In the context of § 1513 retaliation, courts have inferred retaliatory intent from circumstantial evidence such as "the natural consequences likely to flow from the defendant's actions," including fear on behalf of a witness, *Stoker*, 706 F.3d at 646; the lack of a justifiable reason for defendant's adverse actions against a witness, *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir.2014); evidence showing the defendant was aware the witness had provided information to the prosecution, had spoken with others who carried out the retaliatory actions, and did not like snitches, *United States v. Tapia*, 59 F.3d 1137, 1141 (11th Cir.1995); and evidence

---

**7.** 18 U.S.C. § 1513(e) is a codification of section 1107 of the Sarbanes–Oxley Act of 2002, which Congress enacted to prevent the type of corporate fraud that led to the collapse of Enron Corporation. Recently, the Supreme Court reviewed another provision of Sarbanes–Oxley that was also codified into the federal criminal code, 18 U.S.C. § 1519, to determine whether it applies beyond the context of corporate fraud. *Yates v. United States*, —— U.S. ——, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015). The Court looked to § 1519's placement in the criminal code, not-

ing that Congress codified it among "specialized provisions expressly aimed at corporate fraud and financial audits." *Id.* at 1084. In contrast, § 1513(e) was "inserted within the pre-existing § 1513, which addresses retaliation against a victim, witness, or informant in any official proceeding." *Id.* Therefore, unlike § 1519, which the Court ruled applies only in the context of corporate fraud, § 1513(e) applies generally to retaliation against informants in any federal proceeding. *Id.*

describing "the context in which the alleged [retaliatory actions] were made, the prior relationship between [the defendant] and [the victim]," and the effect the retaliatory actions had on the victim's emotions or conduct, *United States v. Brown*, 937 F.2d 32, 36 (2d Cir.1991). In other similar contexts, this court has ruled that "[t]iming can be circumstantial evidence of retaliatory intent." *Poole v. Cty. of Otero*, 271 F.3d 955, 961 (10th Cir.2001) (retaliatory prosecution case), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006).

In this case, Mr. Camick contends the Government's circumstantial evidence failed to show he had a retaliatory intent when he filed the Civil Rights Lawsuit against Ms. Wattley. He argues that because the allegations in the Civil Rights Lawsuit were true and were unrelated to Ms. Wattley's cooperation with the government's prosecution of this criminal action, and because he began taking civil action against Ms. Wattley well before he was indicted, the evidence shows that he did not have a retaliatory motive for filing the Civil Rights Lawsuit. In contrast, the Government argues the evidence of Mr. Camick's knowledge that Ms. Wattley would be a witness against him, the Kansas trial court's dismissal of the Civil Rights Lawsuit, and Mr. Camick's inclusion of false allegations in the Civil Rights Lawsuit all support an inference of retaliatory intent.

Viewing the evidence in the light most favorable to the Government, as we must, *see Porter*, 745 F.3d at 1050, we conclude the evidence supports an inference that Mr. Camick filed the Civil Rights Lawsuit with the intent to retaliate against Ms. Wattley. First, a reasonable jury could conclude that the timing of Mr. Camick's filing of the Civil Rights Lawsuit provides circumstantial evidence of a retaliatory intent. The conduct that formed the basis of the allegations in the Civil Rights Lawsuit took place in 2011. Yet Mr. Camick waited until July 2013, after he had been charged with the present crimes and after he became aware that Ms. Wattley would be a witness against him, to file the Civil Rights Lawsuit. And although Mr. Camick asserts he began taking action to bring a claim against Ms. Wattley two years before he was indicted, the evidence does not support this contention. At best, the record suggests Mr. Camick first contemplated bringing a civil rights suit against Ms. Wattley in January 2013, while he was defending against the Kansas criminal charges for vehicle theft. Mr. Camick discussed bringing civil charges against Ms. Wattley with his criminal defense attorney, who suggested he seek other legal counsel if he wished to pursue those claims. Instead, Mr. Camick chose to file the Civil Rights Lawsuit pro se after he had been indicted and after the district court had ordered him to not contact Ms. Wattley. If anything, the fact that Mr. Camick contemplated filing a suit against Ms. Wattley early on, but waited to actually take concrete action in that direction until after she became a witness against him, supports an inference that Ms. Wattley's cooperation with the Government motivated Mr. Camick to name her as a defendant in the Civil Rights Lawsuit. Thus, when viewed in the light most favorable to the Government, the timing of Mr. Camick's filing of the Civil Rights Lawsuit supports an inference of retaliatory intent.

Second, we agree with the Government that the outcome of the Civil Rights Lawsuit—i.e., the district court's dismissal of the case for failure to state a claim—

supports a reasonable inference that Mr. Camick intentionally filed a nonmeritorious suit in retaliation against Ms. Wattley. Indeed, other courts have relied on the filing of nonmeritorious or frivolous lawsuits as evidence of obstruction of justice and witness harassment. *See United States v. Hopkins,* 509 Fed.Appx. 765, 784–85 & n. 14 (10th Cir.2013) (affirming sentencing enhancement for obstruction of justice based in part on defendant's lawsuit against investigating IRS agents that was dismissed for failure to state a claim and defendant's baseless bankruptcy petition); [8] *United States v. Lewis,* 411 F.3d 838, 845–46 (7th Cir.2005) (concluding that filing a lawsuit against a victim or witness in a criminal matter can constitute harassment under 18 U.S.C. § 1514 and therefore affirming the issuance of a protective order); *United States v. Rosnow,* 977 F.2d 399, 404, 410 (8th Cir.1992) (per curiam) (affirming convictions for obstruction of IRS investigation in violation of 26 U.S.C. § 7212(a) based on the filing of meritless federal tort claims act against IRS agents).

We are not persuaded by Mr. Camick's response that the allegations against Ms. Wattley were true and that it is unreasonable to infer retaliatory intent from the dismissal of a lawsuit that contained truthful allegations. The truthfulness of Mr. Camick's factual allegations does not undermine the fact that the district court found the legal theories Mr. Camick advanced against Ms. Wattley nonmeritorious. In other words, even if Mr. Camick's allegation that Ms. Wattley filed an improper stolen vehicle report were true, a jury could still infer that his legal theories were so divorced from reality that he filed

the Civil Rights Lawsuit not because he thought he might win on the merits, but because he intended to retaliate against Ms. Wattley by forcing her to defend against meritless claims.

Moreover, the Government refutes the truthfulness of many allegations Mr. Camick raised in the Civil Rights Lawsuit, including his claims that he was a legal U.S. resident, that he and Ms. Wattley were married by common law, and that he had never been in trouble with the law prior to the vehicle theft case brought against him. The presence of false allegations in the Civil Rights Lawsuit thus undermines Mr. Camick's reliance on the truthfulness of his claims in challenging the Government's evidence of retaliatory intent.

Of course, a retaliatory intent is not the *only* reasonable inference that can be drawn from this evidence. But it is *a* reasonable inference, which is sufficient to support a conviction under our standard of review on appeal. *See Stoker,* 706 F.3d at 646 (affirming a conviction under § 1513(e) despite the possibility that a reasonable person could view the defendant's action as lacking a retaliatory intent, because a reasonable person could also reach the opposite conclusion). We therefore affirm Mr. Camick's conviction for obstruction of justice in violation of 18 U.S.C. § 1513(e).

For these reasons, we reverse in part and affirm in part the district court's denial of Mr. Camick's motion for judgment of acquittal. Specifically, we reverse his convictions for mail fraud, wire fraud, material false statement, and aggravated identity theft because the evidence was insufficient

8. Though not precedential, unpublished decisions "may be cited for persuasive value."

10th Cir. R. 32.1.

on these counts. But the Government presented sufficient evidence showing Mr. Camick obstructed justice, and we therefore affirm his conviction on that count.

## B. Restitution

 Mr. Camick's final challenge is to the district court's award of restitution, which is governed by the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A. When reviewing a challenge to a restitution determination, "[w]e review the district court's application of the MVRA de novo, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion." *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir.2008) (emphasis omitted). Here, Mr. Camick contends that portions of the district court's restitution award were improper because the Government failed to demonstrate that Mr. Camick's conduct of conviction caused the harms alleged by Ms. Wattley. Because causation is a factual issue, we review the district court's causation determination for clear error. *United States v. Shengyang Zhou*, 717 F.3d 1139, 1155 (10th Cir.2013) (explaining in the context of a restitution challenge that "[w]hether the government established causation is a fact issue").

 "[R]estitution is limited to losses caused by the conduct underlying the offense of conviction." *United States v. Brewer*, 983 F.2d 181, 184 (10th Cir.1993).

The Government carries the burden of proving causation by a preponderance of the evidence in the context of restitution. *United States v. Diamond*, 969 F.2d 961, 965 (10th Cir.1992). To meet that burden, the Government must "show both that the defendant's conduct is the 'but-for' cause of the individual's harm and that the defendant 'proximately' caused the harm." *United States v. Speakman*, 594 F.3d 1165, 1171 (10th Cir.2010); *accord* 18 U.S.C. § 3663A ("[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."). The "main inquiry for causation in restitution cases is whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." *Speakman*, 594 F.3d at 1171 (alterations and internal quotation marks omitted); *see also United States v. West*, 646 F.3d 745, 751 (10th Cir.2011) (reversing a restitution award resulting from the defendant's use of his car "to repeatedly hit the police cars and the convenience store before he was arrested" because the injuries caused by defendant's attempt to resist arrest were not "caused by the underlying ... crime").

In this case, Ms. Wattley filed a Declaration of Victim Losses, which the probation office reviewed and approved, with the exception of three of Ms. Wattley's reported losses. The probation office thus recommended the following amounts of restitution:

| | |
|---|---|
| • Attorney fees in the Civil Rights Lawsuit | $8,315.50 |
| • Finance charges on the loan obtained to pay retainer in the Civil Rights Lawsuit | $1,150.00 |
| • Attorney fees in the quiet title action | $500.00 |
| • Attorney fees in a state lawsuit against Mr. Camick for manipulation of storage fees and costs | $2,672.50 |
| • Court costs in the state storage fee lawsuit | $248.00 |
| • Attorney fees in Provisional Patent Application review process | $2,300.00 |
| **Total** | $15,186.00 |

▉ Over Mr. Camick's objections, the district court agreed to the $15,186 restitution award. On appeal, Mr. Camick challenges the $500 award for attorney fees in the quiet title action; the $2,672.50 for attorney fees and $248 in court costs incurred in a separate state lawsuit against Mr. Camick for storage fees; and the $2,300 in attorney fees Ms. Wattley paid to review the Provisional Patent Application. Mr. Camick does not challenge the $8,315.50 and $1,150.00 awards for Ms. Wattley's fees and costs in defending the Civil Rights Lawsuit.

We agree that the Government did not satisfy its burden of showing Mr. Camick's conduct of conviction caused these loss amounts. First, we can easily set aside the $500 award for the costs Ms. Wattley incurred in the quiet title action and the $2,300 restitution award for the costs she incurred in reviewing the Provisional Patent Application based on our reversal of Mr. Camick's convictions for mail fraud, wire fraud, and material false statement. Because Mr. Camick's filing of the Quiet Title Letter and the Provisional Patent Application are no longer valid bases for any convictions, we reverse the corresponding $500 and $2,300 portion of the restitution award.

We are also persuaded that the district court erred in overruling Mr. Camick's objection to the restitution award of $2,672.50 and $248 for attorney fees and court costs incurred in a separate lawsuit against Mr. Camick for manipulating company storage fees without requiring the Government to demonstrate that these costs were caused by the conduct underlying Mr. Camick's conviction. On appeal, the Government has not adequately explained how Mr. Camick's conduct of con-

viction caused Ms. Wattley to suffer these losses. Because we have reversed Mr. Camick's other convictions, the Government must show that Mr. Camick's conduct underlying his obstruction of justice conviction was the but-for and proximate cause of Ms. Wattley's losses in the state storage fee lawsuit. The Government points to nothing in the record that supports such a conclusion.

We therefore reverse the $500 and $2,300 restitution awards incurred with respect to the quiet title action and Provisional Patent Application because there is no longer any conduct of conviction related to those expenses. With respect to the $2,672.50 and $248 restitution awards in connection with the separate storage fee litigation, we reverse the awards but remand to provide the Government an opportunity to prove that Mr. Camick's conduct underlying his obstruction of justice conviction was the but-for and proximate cause of Ms. Wattley's losses.

## IV. CONCLUSION

We **REVERSE** Mr. Camick's convictions for mail fraud, wire fraud, material false statement to the PTO, and the three related counts of aggravated identity theft. We **AFFIRM** Mr. Camick's convictions for obstruction of justice. We **REVERSE** in part the award of restitution and **REMAND** for a hearing during which the Government may put forward evidence demonstrating Mr. Camick's conduct of conviction caused the challenged losses to Ms. Wattley.

KELLY, Circuit Judge, concurring in part and dissenting in part.

This case tests the boundaries of several of the most capacious provisions of federal

criminal law. I agree with the court that Mr. Camick's convictions for mail fraud, wire fraud, and a material false statement must be reversed. I also agree that each of the associated aggravated identity theft convictions must be reversed. And, I agree that much of the restitution Mr. Camick was ordered to pay was improper. I dissent only as to the court's conclusion that Mr. Camick's filing of an ultimately unsuccessful lawsuit against Ms. Wattley is sufficient to support his conviction for obstruction of justice under 18 U.S.C. § 1513(e). In my view, no rational juror could find, beyond a reasonable doubt, that Mr. Camick had the requisite intent to retaliate against Ms. Wattley for her involvement in the criminal proceedings against him. Section 1513(e), like each of the other criminal laws at issue in this case, cannot be stretched so far as to encompass Mr. Camick's conduct.

On July 19, 2013, Mr. Camick filed a pro se civil rights lawsuit against Ms. Wattley and several others involved with the 2011 reporting of Mr. Camick's allegedly stolen truck—an event wholly unrelated to the other charges in this case.[1] The court concludes that, because Mr. Camick's suit was filed after he discovered Ms. Wattley would be a witness against him in criminal proceedings, and because his suit ultimately was found to lack merit, a rational juror could have concluded the lawsuit was filed with retaliatory intent. I disagree.

First, although timing "*can* be circumstantial evidence of retaliatory intent,"

*Poole v. Cty. of Otero*, 271 F.3d 955, 961 (10th Cir.2001) (emphasis added), it is not here. Mr. Camick sought to have Ms. Wattley charged for falsely reporting a stolen vehicle long before the instant criminal proceedings against Mr. Camick were initiated. Ms. Wattley testified that she was aware Mr. Camick "had asked the New Mexico authorities to bring criminal action against [her] for filing a false police report" in April 2012—nearly a year before he was indicted in the present criminal proceedings. 3 R. 484. Moreover, as the court acknowledges, Mr. Camick discussed bringing civil rights claims against Ms. Wattley with a criminal defense attorney in January 2013—again, prior to his indictment in this case. *Id.* at 644–45. The attorney declined representation and suggested Mr. Camick seek other counsel.

This timeline of events belies the conclusion that Mr. Camick filed suit to retaliate against Ms. Wattley for her involvement in the criminal case against him.[2] Furthermore, this is not a case like *Poole*, where the allegedly retaliatory action was taken within one week of the protected activity. 271 F.3d at 958. Mr. Camick filed the civil rights suit against Ms. Wattley nearly four months after he was indicted and nearly three months after he learned she would be a witness against him. 3 R. 52. This court has held elsewhere that an inference of retaliatory intent "can *only* be made ... where 'close temporal proximity' exists" between the protected activity and alleged-

---

1. Mr. Camick's suit named Ms. Wattley, the District Court of Cowley County, the Winfield Police Department, Attorney General Eric Holder, KaiTraxx LLC, Cowley County D.A. Christopher Smith, Winfield Police Department Officer Nicole Hills, and U.S. Attorney Barry Grissom. II Supp. R. at 322. The fact that Mr. Camick filed suit against a host of parties beyond just Ms. Wattley further under-

cuts the government's contention that he filed the suit to retaliate against Ms. Wattley.

2. Notably, Mr. Camick filed suit on July 19, 2013, exactly two years after Ms. Wattley reported the truck as stolen on July 19, 2011. This supports Mr. Camick's assertion that he filed suit immediately before he believed the applicable limitations period would expire.

ly retaliatory action.[3] *Candelaria v. EG & G Energy Measurements, Inc.,* 33 F.3d 1259, 1262 (10th Cir.1994) (emphasis added) (citation omitted); *see Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.1982). Notably, we have rejected an inference of retaliatory motive where adverse action came three to four months after protected activity. *See Conner v. Schnuck Mkts., Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (four months); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three months); *see also Meiners v. Univ. of Kan.,* 359 F.3d 1222, 1231 (10th Cir.2004) (no inference of causal connection where adverse action came at least two months and one week after protected activity); *Hansen v. Alta Ski Lifts Co.,* 141 F.3d 1184, at *3 (10th Cir.1998) (unpublished table decision) ("[A] period of three or four months or more between the protected activity and the adverse action generally is insufficient to support an inference of causation."). In short, the timing of Mr. Camick's lawsuit against Ms. Wattley does not support an inference of retaliatory intent.

The only remaining evidence of Mr. Camick's retaliatory intent is that his civil rights lawsuit contained some disputed allegations and was ultimately found to be without merit. The claims were not frivolous, vexatious, or malicious (unlike the cases relied on by the court[4])—the district court simply found them to be without merit. Further, the court did not reject Mr. Camick's state law claims against Ms. Wattley on the merits—it simply declined to exercise supplemental jurisdiction over them. II Supp. R. 341–42. Drawing any inference of retaliatory intent from these facts is entirely unwarranted, especially here, where Mr. Camick brought his claims pro se and was entitled to have his pleadings construed liberally. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). Obstruction of justice charges under § 1513(e) carry a term of imprisonment of up to ten years. As such, I am deeply hesitant to rest Mr. Camick's conviction on so thin a reed. Doing so will chill potential litigants' exercise of their established constitutional right to access the courts. *See Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

For the foregoing reasons, I respectfully dissent.

**BANCINSURE, INC., Plaintiff Counter Defendant–Appellee,**

---

3. Like the court, we find no Tenth Circuit authority discussing an inference of retaliatory intent based on temporal proximity in the specific context of an obstruction charge and thus rely on cases discussing the inference in other contexts.

4. *See United States v. Hopkins,* 509 Fed.Appx. 765, 782–85 & n. 14 (10th Cir.2013) (unpublished) (upholding an obstruction enhancement (not a conviction) based partially (not exclusively) on defendant's filing of "frivolous" (not simply nonmeritorious) lawsuits and a "frivolous" bankruptcy petition); *see also United States v. Lewis,* 411 F.3d 838, 843–46 (7th Cir.2005) (holding that district court did not abuse its discretion in issuing protective order halting lawsuit against witness that "on its face appear[ed] to be vexatious"); *United States v. Rosnow,* 977 F.2d 399, 410 (8th Cir.1992) (per curiam) (affirming obstruction convictions based on filing of "frivolous federal tort claim" against IRS agents).